**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

**No. 98-20385**

**MAX ALEXANDER SOFFAR,**

**Petitioner-Appellant,**

**VERSUS**

**GARY L. JOHNSON, DIRECTOR,**
**TEXAS DEPARTMENT OF CRIMINAL JUSTICE,**
**INSTITUTIONAL DIVISION,**

**Respondent-Appellee.**

Appeal from the United States District Court
for the Southern District of Texas

December 21, 2000

Before EMILIO M. GARZA, DeMOSS and DENNIS, Circuit Judges.

DeMOSS, Circuit Judge:

Petitioner Max Alexander Soffar, convicted of capital murder[1] and sentenced to death by a Texas state court seeks a certificate of probable cause ("CPC") to appeal the district court's dismissal of his first federal application for writ of habeas corpus, which he filed pursuant to 28 U.S.C. § 2254. The federal district court

---

[1] Soffar was convicted for the murder of Arden Alane Felsher while in the course of committing the robbery of Stephen Allen Sims, which elevated the crime from murder to capital murder. *See* TEX. PENAL CODE § 19.03.

refused to grant Soffar an evidentiary hearing and granted summary judgment in favor of Director Johnson, who has custody of Soffar pursuant to his capital conviction. The district court then entered an order denying Soffar's application for writ of habeas corpus. Soffar's application for a CPC is governed by Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). We therefore construe Soffar's request for a CPC as a request for certificate of appealability ("COA"), and because we have determined that Soffar has made a substantial showing of the denial of a constitutional right with respect to his claim that the State violated his Fifth Amendment rights by interrogating him while he was in custody after he had invoked his right to counsel, we grant him a COA as to that issue. We also grant Soffar a COA as to (1) his claim that the State violated his Sixth Amendment rights by interrogating him after he had requested and been appointed counsel, and while he was in custody regarding an extraneous offense presented during the penalty phase of his murder trial, and (2) his claim that he was denied effective assistance of counsel based upon his trial counsel's alleged failure to investigate, develop, and present available evidence with respect to the surviving witness's statements to police or with respect to ballistics evidence. Because we have also determined, based upon the undisputed facts and for the reasons discussed herein, that Soffar's conviction and sentence for capital murder are constitutionally infirm by virtue of the State's violation of

Soffar's right to counsel during custodial interrogation, we reverse the district court's order granting the Director's motion for summary judgment and remand this case to the district court for entry of an order (i) granting Soffar's application for writ of habeas corpus, (ii) setting aside Soffar's conviction and sentence for capital murder, and (iii) ordering Soffar's release unless the State commences a re-trial of Soffar within 120 days. Our decision today renders MOOT all motions pending in this Court.

## I. BACKGROUND

We have conducted an independent and exhaustive review of the entire record of this case. The following extensive factual background is taken primarily from the facts found by the state and federal habeas courts, but we have also included those additional relevant facts which, based upon the record before us, we find to be undisputed. We note at the outset that this case involves a peculiar and unique set of factual circumstances the likes of which no court has yet seen, nor likely ever will see again.

### A. The Offense

In either the late evening hours of Sunday, July 13, 1980, or the early morning hours of Monday, July 14, 1980, four young people were each shot in the head during the course of a robbery at the Fairlanes-Windfern Bowling Alley, located at 14441 Northwest Freeway, approximately 13.5 miles northwest of downtown Houston,

Texas.  The victims included Stephen Allen Sims, a young male who was the assistant manager of the bowling alley; Tommy Temple, a young male employee of the bowling alley; Arden Alane Felsher, a young female non-employee; and, Gregory Garner, another young male employee of the bowling alley.  Garner was the only victim who survived.

During the night immediately preceding the robbery-murders, the Windfern Bowling Alley had been burglarized.[2]  The side door of the bowling alley, which was broken by the burglars to gain entry the night before, had not been fixed by the next evening and could not be locked.  As a result, at around 7:30 p.m. on the night of the 13th, Jim Peters, the manager of the bowling alley, asked Greg Garner and Tommy Temple, to stay late after closing to keep an eye on the premises, at least until the early morning cleaning crew arrived at approximately 4:00 a.m.  At approximately 9:30 p.m., Garner moved his car across the street into the parking lot of the Houston First Church of God, which was directly across the Northwest Freeway[3] from the bowling alley, so that after closing it

---

[2]  At the time of the robbery-murders in this case, two of the four suspects from the previous night's burglary of the bowling alley were still at large, though they were apprehended within a day or two of the robbery-murders.  The other two suspects had already been arrested for the burglary.  The four youths who were involved in the burglary the night before disavowed any knowledge of, or association with Max Soffar or his alleged accomplice Latt Bloomfield.

[3]  At the time of the robbery, the Northwest Freeway was a four-lane, divided highway with two one-way outbound lanes (which the church fronted), separated by a grassy median from the two one-way

would appear that no one was at the bowling alley. Just as the bowling alley closed, a robber or robbers entered the bowling alley, shot the four individuals, and absconded with approximately $1,000 in cash.

Shortly after the robbery and shootings, at approximately 12:08 a.m., Greg Garner managed to telephone his mother, Nellie Garner, from the control booth next to where he and the other victims were lying. He relayed to his mother that someone had been at the bowling alley and that he needed help. His mother told him that she was sending his father, Ira Garner, to the bowling alley and she asked her son if he was all right. After Greg responded "yeah, I'm all right," the bowling alley's other phone line rang and Greg told his mother that he was putting her on hold. The other caller was Jim Peters, who was calling to check and make sure that everything was in order at the bowling alley. Mr. Peters testified that Garner's speech was garbled but that Garner told Mr. Peters either "we, he, or they" made us lay down. Peters, sensing that something was awry, told Garner that he was going to call the police. After Peters called the police, he started on his own trip to the bowling alley. When Greg Garner returned to the phone line with his mother, he told her again that he was all right and that the robber or robbers had just left. He answered his mother's questions by telling her that he was bleeding from the side of his

---

inbound lanes (which the bowling alley fronted).

head and that he was holding his eyeball.  Mrs. Garner then hung up the phone and headed towards the bowling alley.

After he hung up the phone with his mother, Garner walked over and laid down next to Arden Felsher, who was the only other victim still alive at the time.  When he laid down next to Felsher, he was positioned closest to the front door of the bowling alley, just inside the doors.  Garner's father was the first to arrive at the scene.  When he arrived, he parked his car in front of the building with his headlights facing the front door.  This illuminated the inside of the bowling alley and he saw four people lying on the floor.  When he honked his horn, he could see his son lift his head and it was immediately apparent to him that Garner was injured.  He ran inside, comforted his son, and then tried to telephone for help from the bowling alley phone.  He was unable to make the call because he could not get an outside line.  He then drove across the freeway to the church and asked a woman, who had gathered with several others awaiting the return of their children from a church youth trip, if she would call the police.  He then returned to the bowling alley.

As Ira Garner described the scene, his son was closest to the door on his stomach; Felsher was lying on her stomach, still alive, next to his son; Sims was lying dead on his stomach next to Felsher; and Temple was lying dead on his stomach on the other side of Sims.  The first three victims were lying closer to the control booth where the cash register was located, and Temple was located

6

closer to the concession area.[4]  Photographs of the crime scene indicate that, in general terms, Felsher's, Sims's, and Temple's bodies were positioned in a somewhat semi-circular array, with a greater distance separating Temple from Sims.  Garner was found aligned next to Felsher, but as discussed below, by his own account, and consistent with a bullet hole found in the carpet between the bodies of Sims and Temple, he was lying between Sims and Temple when he was shot, thus filling the gap in what would have been a fully semi-circular configuration at the time of the shootings.

After Ira Garner had arrived back at the scene, Jim Peters arrived, and he was followed shortly thereafter by Mrs. Garner. Additionally, two men from the church across the street arrived at

---

[4]  Physically, the bowling alley was set up as follows.  As one entered the two sets of glass front doors, a concession area/snack bar was to the left, and the main control booth/cash register area was located on the right, approximately 8 feet from the front doors.  Temple's body was found approximately 15 feet from the left set of front double doors, with his head pointed towards the snack area to the left.  Garner's body was found just inside the right set of front double doors with his head pointed somewhat towards the front doors-he was located just at the front corner of the control booth with his feet roughly perpendicular to the booth. Beyond him was the body of Felsher, who was lying approximately 11 feet inside the right set of doors, next to, and perpendicular to the control booth, with her head pointed in the direction of the snack bar.  Just beyond Felsher, Sims's body was found approximately 14 feet inside the right set of doors, with his feet positioned next to, and perpendicular to the area of the control booth with swinging doors providing access to the cash register, but his torso was angled towards the front doors.  While Temple's and Sims's bodies were roughly equidistance from the front doors, more than 8 feet separated their bodies along the left to right dimension of the bowling alley.  Just beyond the feet of Temple's body were the seats in front of the individual bowling lanes.

the scene to assist. Felsher was flipped over onto her back to clear her airway because according to those present, she was gurgling blood. Police and medical personnel arrived at the scene shortly thereafter. Dr. Daniel Bethingcord, a second-year resident from Hermann Hospital, was a member of the life-flight team of medical personnel that arrived later at the scene by helicopter. He directed efforts taken over from the fire department EMS personnel to resuscitate the only two living victims found on arrival, Felsher and Garner. Felsher was given priority of treatment because of her critical condition. All efforts to resuscitate Felsher were unsuccessful and she was pronounced dead at 1:40 a.m.

Dr. Bethingcord then turned his efforts to treating Greg Garner, who had previously been determined to be in more stable condition. Dr. Bethingcord thought Garner had suffered from two gunshot wounds to the head, but it was "difficult to tell which was the entrance and which was the exit." In fact, it was later determined by Dr. Phillip Gildonburg, the neurosurgeon who performed surgery on Garner at the hospital, that the bullet which hit Greg Garner entered just above and in front of his left ear, and exited just below his left eye. The bullet also caused some skull fragmentation resulting in embedded bone fragments in a small portion of Garner's brain. As result of his injuries, Greg Garner

8

ultimately lost his left eye.[5]  Once Greg Garner had been airlifted

to the hospital, the police began their investigation of the crime

scene in earnest.

Autopsies later revealed that the victims suffered the

following injuries.  Tommy Temple suffered a gunshot wound to the

head which entered the back of his head on the left side and the

bullet remained lodged in his right ear, never exiting his body.

Steven Sims suffered a gunshot wound to the head which entered the

back of his head on the left side and which exited his left cheek;

---

[5]  Dr. Gildonburg testified at Soffar's trial during the State's case-in-chief regarding Garner's injuries.  He also testified that, in his medical opinion, it was "possible" that Garner's injuries could have caused him to suffer from a condition known as retrogressed amnesia.  This condition, according to the doctor, results when the  portion of the brain which classifies and stores recent memory suffers trauma from a concussion.  When such a concussion occurs,  memory of events immediately preceding the trauma can be temporarily, and in severe cases, permanently "wiped out."  The more severe the trauma, the farther back in time preceding the trauma might the memory loss be.  The doctor conceded that it is possible that all memory would return and that none would be lost.

Aside from Dr. Gildonburg's testimony, no other explanation for Greg Garner's absence as a witness, either for the State or the defense, was presented.  As the Texas Court of Criminal Appeals noted on direct review of this case, "[a]mazingly, the State presented no direct testimony or evidence at [Soffar's] trial that would have accounted for Garner's absence at trial."  *Soffar v. State*, 742 S.W.2d 371, 373 n.1 (Tex. Ct. Crim. App. 1987) (en banc).  We pause here to note that what most accurately accounts for the State's failure to call Garner as a witness, as will be discussed *infra*, is the fact that Greg Garner's account of the details of the robbery and shootings differs radically from the account of events put forth in Soffar's confessions.  If Garner had testified at trial consistent with the various statements he made to the police, his testimony would have significantly undermined the credibility and accuracy of Soffar's confessions.

he also suffered surface wounds on the front of his chest which resulted from bullet fragmentation. Arden Alane Felsher suffered a gunshot wound to the head which entered the front of her face just under her right cheek and which exited near the rear center of the top of her head. As stated above, Greg Garner suffered a gunshot wound to the head which entered the side of his head just in front of and above his left ear and which exited his left cheek, just below his left eye. Gunshot wounds were ruled the causes of Temple's, Sims's, and Felsher's deaths.

## B. The Investigation

The crime scene itself was most aptly described at Soffar's trial as "contaminated" in the sense that medical personnel attempting to resuscitate Felsher and Garner disturbed the positioning of the bodies and left debris scattered throughout the area surrounding the bodies. Additionally, Garner's parents, the bowling alley manager, and two men from the church across the street entered the crime scene, moving items around and touching crucial areas of the crime scene. The forensic technicians testified that they had a difficult time recovering very many usable fingerprints. Despite this fact, several fingerprints and one palm print were lifted from the area surrounding the cash register. It was later determined that none of these fingerprints matched the fingerprints of either Max Soffar or Latt Bloomfield,

10

Soffar's alleged accomplice.

Investigating officers who questioned those present at the crime scene determined that there were no eyewitnesses to the shootings, but one individual by the name of Frank Karibus told a Houston homicide detective, G. J. Novak, that from his vantage point across the street at the church several hundred yards away, he had seen someone running from the bowling alley and getting into a small brown car, possibly a Honda. He initially described the individual as 5'-8" to 5'-9" with blonde shoulder length hair, but later gave a varying description of the individual he saw. Karibus was never called as a State witness to identify Max Soffar. Melvin Neal, the youth pastor at the church testified that it would be virtually impossible to specifically identify any individual at night from across the highway.

Investigating officers also learned from pastor Neal that the church had been burglarized in the late evening hours of that same night as well. At some point that evening, entry was made into the church through a pried open door and the church's main office had been broken into and ransacked. Crime scene investigators were dispatched and attempted to lift fingerprints from the church as well.

During the night of the murders, an interested and curious local citizen, Richard Civitello, who came to the scene sometime after he heard about it on his police scanner, pulled into the parking lot and saw a billfold in the path of his headlights. He

11

stopped, picked it up, and turned it over to investigating officers at the scene.  That wallet belonged to Steven Sims.  The very next day, a truck driver by the name of Andrew Davis, passed by the bowling alley on the inbound lanes of the Northwest Freeway. Traffic was bogged down, and as Davis looked out of his window he noticed a billfold on the pavement next to the grassy median separating the inbound and outbound lanes, approximately 100 yards from the bowling alley.  The wallet was on what would be the driver's side of an inbound vehicle.  He pulled over so that he could walk back and retrieve the wallet he had seen.  On his way back he spotted a second billfold in the same area.  One of the wallets contained some money and both contained various other papers.  Based on the information contained on the identification cards in the wallets, Davis tried to contact Greg Garner but was initially unsuccessful.  He eventually reached Ira Garner, who informed him that the wallet belonged to his son, who had been shot in a robbery the night before.  After learning this, Davis called the police and turned the wallets over to one of three officers who, the next day, accompanied him back to the location where he had found the wallets.

Forensic evidence obtained from the crime scene the night of the murders, and during subsequent investigations of the crime scene yielded the following evidence.  Four bullet holes were found in the carpeting of the bowling alley.  One hole, which contained a large fragment representing the remainder of a bullet, was

12

located just above the area where Felsher's head was originally positioned. A second bullet hole, also containing a large fragment was located at or just below the location of Sims's head. A third, elongated hole was located near Sims's body, closer to his torso, accompanied by a dent in the padding of the carpet. A fourth hole located to the right of Sims's head contained a bullet embedded in the padding of the carpet. No bullet hole was found anywhere near Temple's body, because the bullet which killed him never exited his body. And no bullet hole was found anywhere near where Greg Garner was found lying either. Rather, the extra bullet hole, which was not closely aligned with any victim's exit wound as the bodies were found, was between Sims's and Temple's body, and plausibly represented the point of exit from Garner's head.[6]

Homicide detectives pursued all available leads to the fullest extent, but had little success. The news media reported widely on the police investigation and reported all pertinent details as they

---

[6] This fact is particularly significant, because as noted *infra*, Greg Garner stated to the police that he was lying between Sims and Temple when he was shot and that his position closest to the door resulted from his having moved from between Sims and Temple to a position between the front doors and Felsher after he got up and called his mother. Also, as noted *infra*, Soffar's confession recites that the victims were shot in the order in which they lay when they were discovered; that is, male, female, male, male, and not female, male, male, male as Garner repeatedly explained the shootings to police. The importance here lies in the fact that the ballistics evidence better supports Garner's account of the body positions at the time of the shootings than it does Soffar's confession. These and other inconsistencies between Soffar's confession and Garner's account of events are discussed in Part I.E. *infra*, and are summarized in Appendix A to this opinion.

became available from the police. For example, as early as the day after the shootings, the press reported that the bowling alley had been burglarized the night before, that four victims were shot in the head, execution style, with the males being shot in the left side of the backs of their heads, and the female shot in the cheek, that wallets were found close by, and that money was taken from the register. The press also reported on the $10,000 reward being offered by the Fairlanes Company, and later that the reward was increased to $15,000 by a private donor.

At the scene, Greg Garner was unable to make any statement to aid in the police investigation. He underwent more than seven hours of surgery the morning of July 14th and remained in critical condition for several days. However, as his condition was improving by July 17th, Garner's treating physician advised the homicide detectives that Garner was independently remembering details of the offense and was alert enough to briefly speak with detectives. Over a period of four days, Garner spoke with homicide detectives on four separate occasions, and each conversation was both tape recorded and transcribed by the police.[7] The essence of

[7] The state habeas court sustained the State's objections to the admission of both the transcripts of Garner's statements and a diagram of the victims' body positions at the time of the shootings penned by Garner, on the grounds that the transcripts and the diagram were not relevant since Garner was not called as a witness. In our view, the state habeas court's failure to admit these matters constituted plain and clear error. Furthermore, the failure to admit these items rebuts any presumption of correctness to which the state habeas court's factual determinations regarding Soffar's claim that his trial counsel was ineffective for failing

14

each of Garner's interviews with the detectives is abstracted as follows:

### i. Garner's July 17, 1980 Statement

On the morning of July 17, 1980, Greg Garner gave his first taped interview with Houston homicide detectives Miland Kardatzke and Gil Schultz. This first interview occurred only three days following his surgery and was relatively brief. The dialogue contained in the transcript is direct in that the detectives did not employ either leading or suggestive questions. However, in this first interview, which had to be cut short, Garner's responses can at times best be described as garbled, but he was nevertheless able to relay to the detectives the following basic information.

At the time of the robbery there were four individuals present at the bowling alley. Approximately one hour after the doors were locked, the lone robber, a male individual whom Garner had never seen before, came into the bowling alley through the front door and asked all four to lie down near the control booth. Garner indicated that the robber gained initial entrance into the bowling alley by convincing the night manager, Steven Sims, that he needed

---

to investigate Garner's inconsistent account of the robbery-murder, would otherwise be entitled because, under 28 U.S.C. § 2254(d)(3), such a failure to admit these materials would necessarily mean that "the material facts were not adequately developed at the State court hearing." Likewise, the State court's failure to admit these materials leads us to conclude that, under § 2254(d)(2), "the fact finding procedure employed by the State court was not adequate to afford a full and fair hearing" on the ineffective assistance claim.

to fill a white plastic container with water for his car. Garner also indicated that Sims and the robber went outside together after the robber talked his way in and that when they came back in, the robber directed Sims to get the money out of the register and made all four of the victims lie down on the floor. After a minute or so, Garner stated that the robber just started shooting and he thought he was shot third.

### ii. *Garner's July 18, 1980 Statement*

At approximately 4:45 p.m. the next evening, Detective Kardatzke returned with Detective Williamson and Officer Yarberra to speak with Garner in his hospital room. In this second interview, which was also taped and transcribed by the police, Garner's responses were more articulate, and he added the following information.

Garner had arrived at work at approximately 5:30 p.m. and worked until closing. He and Tommy Temple were going to stay through the night and Steve Sims was going to leave once he finished his paperwork after closing. Garner recounted how he moved his car across the street to the church so that it would look like no one was there. He stated that Sims locked the front door after closing, but unlocked the door sometime later to let the robber in.

When the robber first arrived, Garner was bowling on lanes 25 and 26. Garner gathered from the context of Sims's and the

robber's actions and conversation that the robber needed to fill a plastic container he was carrying with water for his car. Sims went out the front door with the robber and they returned a short time later. When the two men reentered the building, Garner walked up to see what was going on. He noticed then that the robber had a gun by his side. Garner stated that the robber took Sims over to the register to get the money out and that they were all made to lie down. Then, according to Garner, the robber just shot them, "boom, boom, boom." Garner stated that no one screamed or said anything and that the robber didn't hit anyone. He recalled talking on the phone to both his mother and the manager of the bowling alley whom he referred to as "the head guy."

Garner initially stated that the robber was a black man, but later corrected the detectives by stating "no, he was white." Garner also described the man as approximately 25-28 years old, with no hat or mask. He also described the robber as medium build. In addition to the statement given to the detectives on the 18th, Garner also identified the relative positions of the victims at the time of the shootings in a drawing made during this interview.[8] His depiction of the victims' relative positions matches almost

---

[8] Garner's drawing is initialed by Detective Kenny Williamson, who was present during the July 18th interview with Garner and who testified at the state habeas evidentiary hearing as to the authenticity of the drawing as being Garner's account of the body positions at the time of the shootings. Garner's drawing is attached to this opinion as Appendix "B".

17

identically the police photographs of the crime scene, with the bodies, at the time of shooting, in a semi-circular configuration ordered as follows: Felsher, Sims, Garner, Temple.

### iii. Garner's July 19, 1980 Statement

On the evening of July 19th, Garner gave his third interview with Houston homicide detectives Novak and Magan which was taped and transcribed by the police. Garner reiterated most of the information previously given to the other detectives; that is, that Sims let the robber in after he knocked on the door, that the robber had a container for water for his car and that Sims and the robber exited and returned.

Garner added that when he first approached Sims and the robber, the robber asked him if he could open the register, to which he responded "I don't know how." The robber then made him lie down on the floor. The robber asked Sims if anyone else was there. Temple and Felsher were called up to the front and the robber made them lie down on the floor, too. The robber then stayed in front of the control counter with the gun on everybody and directed Sims to go empty the register and hand over the money. After Sims did this, the robber made him come out from behind the control counter and lie down on the floor just outside of the swinging doors. Garner stated that while on the floor, no one said anything to each other, no one screamed, and the robber didn't hit anyone. Once Sims was back down on the floor, the robber just

18

paused for a minute, said "good-bye," and shot everyone.

Garner recounted again how he got up after the robber left and called his parents, and he remembered the manager of the bowling alley calling him. He then stated that he went back over and laid down in a different position than where he had been shot. He recalled lying down next to Felsher because she was the only one still alive. Garner surmised that he passed out shortly thereafter. He regained consciousness when his father arrived at the scene.

### iv.  Garner's July 20, 1980 Statement

Garner gave his fourth interview with Detective Kardatzke and Detective Ladd the evening of July 20th which was taped and transcribed by the police. He repeated the same general information he had given the three previous days but added that the robber was a little over 6 feet tall, had no facial hair, and had light brown hair pulled back. No additional information was provided at this interview.[9]

---

[9]  We note here that, at the police investigators' request, Garner underwent hypnosis on August 21, 1980, and a report of that session confirmed the general information provided by Garner in his tape recorded interviews of July 17, 18, 19, and 20. Additional information regarding the taking of wallets and the robber's physical description was obtained from this interview. The following is taken from the written summary report of the hypnotic interview which was memorialized on the district attorney's letterhead and signed by Robert J. Bodisch and B. T. Neff.

> The witness stated that he arrived at work at approximately 4:30 p.m. . . . [A]t approximately 9:30 p.m. the bowling alley manager called and asked him to

spend the night at the bowling alley.  The witness told the manager it would be O.K. if he could get another man to do it with him.  The witness stated that he then moved his car to the church across the street.  He stated he moved his car so that nobody could see it.  He stated that the manager also talked to Tommy about staying.  The witness stated that at 11:30 p.m. they were getting ready to close, the customers had left, and at that time Tommy, Steve, Elaine [sic] and himself were the only persons left in the bowling alley.  He stated that he was at the bowlers stand on lane 25-26 with Elaine [sic] and he noticed Steve letting a guy into the front door.  The witness stated that he had never seen the guy before, he had dark hair, a little bit curly around the shoulders, parted down the middle, clean shaven face.  He stated that he did not pay much attention to the guy because he thought Steve knew him.  He stated that the guy went outside but came back in[;] at this time he finished bowling and was walking to the counter.  He stated that Steve and the other person were next to the counter.  The witness stated that as he walked up to the counter the guy asked him if he could get the money out of the register.  He stated that the guy had a gun in his right hand.  The witness stated that he told the guy he couldn't get the money out of the register.  The guy then asked if he had his wallet and the witness replied no. The witness was then told to lay on the floor.  The guy then asked Steve if anyone else was in the place and he replied yes.  The witness further described the guy as 6 feet, 170 lbs., dark hair, skin was white, clean shaven, curly hair-shoulder length-pretty long, average build wearing a short sleeve shirt.  The witness stated that Steve then went to the middle of the counter and called Tommy to come up to the front.  Tommy and Elaine [sic] both arrived and laid down next to the witness.  Steve and the guy then went to the register and got the money and then Steve laid down beside the others on the floor. The guy then again asked for this witnesses [sic] wallet and this time the witness took it out of his back-pocket and placed it in front of his head.  The witness stated that the guy told them they only had 10 or 15 seconds left, and that the guy was nervous.  The witness stated that the guy shot us.  He stated he heard one maybe two shots before he was shot, and that he was not the last one to be shot.  He stated, "I don't know why he shot, he didn't say anything."  The witness stated that the man who shot him was the same man that came in the first time

20

### v. The Composite Drawing

In addition to the information Garner provided to the investigators about how the robbery occurred, he was also able to assist a police artist in developing a composite drawing of the lone perpetrator. Along with the composite drawing, on July 30, 1980, police released Garner's description of the perpetrator as a white man between 25 and 30 years of age, 6'-2", 160 to 185 pounds with brown to dark brown hair worn combed back in front and over the ears, but not touching the collar.[10] The composite drawing and Garner's description were widely publicized in the newspaper and on the local television news.[11]

It is apparent that despite the alleged "retrogressed amnesia" which the State suggested at Soffar's trial rendered Garner's memory unreliable, detectives relied on the credibility of Garner's

---

after they closed.

This hypnotic interview was conducted approximately two weeks after Max Soffar was arrested and charged for capital murder of Felsher, and after Garner was unable to identify Max Soffar in a line-up.

[10] Garner assisted in the production of a second composite drawing of the same perpetrator on August 5, 1980, the day Max Soffar was initially arrested for theft of a motorcycle and first questioned regarding the bowling alley murders. Despite this, he was unable to identify Soffar in a line-up on the next day, August 6.

[11] Indeed, Max Soffar's sister, Jackie Carney, testified that at some point between July 14th and August 5th, and while in her car en route to her doctor, Soffar said "Jackie, you know that composite drawing that I seen on the news, . . . that looked kind of like Latt [Bloomfield], and that would be an easy way to get a $10,000 reward would be to say that Latt did it."

21

statements and composite drawings obtained therefrom throughout their investigation and up until the time that Soffar was arrested. Police statements to the press included the investigators' firm belief that they were looking for one unknown white male "hi-jacker" matching Garner's description who talked his way into the bowling alley by feigning car trouble. After initially receiving over 250 calls in regard to publication of the composite drawing, by August 4, 1980, the exhaustive police investigation into the bowling alley murders had few if any promising leads.

### C. Enter Max Soffar

On August 5, 1980, at approximately 8:00 a.m., a League City, Texas police officer, Raymond Willoughby, observed Max Alexander Soffar traveling approximately 57 miles per hour on a motorcycle in a 45 mile per hour speed zone on the westbound side of West 518 in League City, Texas.[12]

After clocking Soffar's speed from the eastbound side of West 518, Officer Willoughby turned his marked patrol car around and followed Soffar for approximately a quarter of a mile until Soffar pulled into a driveway, dismounted the motorcycle, and proceeded to the side door of the house. Officer Willoughby got out of his patrol car, identified himself as a law enforcement officer, and

---

[12] League City, Texas is located in Galveston County, Texas, and lies approximately 23 miles southeast of downtown Houston, on the east side of Interstate 45.

asked Soffar if he could see his driver's license. Soffar stated that he did not have it with him. He gave the officer the name Mark Scott and a false birth date. The officer asked his dispatcher to run the information Soffar provided to see if Mark Scott had a valid driver's license. The dispatcher responded that the computer was down and she was unable to verify a license at that time. The officer then asked the dispatcher to run the license plate on the motorcycle and she returned with information that the license plate was registered to a different individual and was for a Suzuki motorcycle, not the Honda motorcycle Soffar was riding. The officer got the vehicle identification number ("vin") off of the motorcycle and had the dispatcher run that information to determine to whom the Honda motorcycle was in fact registered. The dispatcher relayed to the officer that a Honda motorcycle with that vin was reported stolen out of Friendswood, Texas.[13] Having decided that he would be placing Soffar under arrest for auto theft, Officer Willoughby requested that the dispatcher send back-up officers to the scene.

### i. Arrest and Initial Interrogation

Officer Willoughby advised Soffar that he was going to place

---

[13] Friendswood, Texas is located in Galveston County approximately 20 miles (as the crow flies) or 23 miles (by highways) south of downtown Houston, and northwest of League City on the west side of Interstate 45. League City and Friendswood are approximately 35 miles away from the Fairlanes Bowling Alley where the murders occurred on the opposite side of Houston.

23

him under arrest for auto theft.  After doing so, he read Soffar his standard *Miranda*[14] warnings from a card bearing the text of such warnings.  Once the back-up officers arrived, Soffar was handcuffed and his pockets were emptied onto the hood of the patrol car. Recovered were a few items of jewelry, several foreign coins, bits of paper, and a small amount of marijuana in a plastic bag.  While the officers waited for a wrecker to arrive and tow the motorcycle to the League City Police Department, Soffar was placed in the back seat of the patrol car.

While Soffar was waiting in the back of the patrol car, Sergeant James Palmire from Soffar's hometown of Friendswood arrived at the scene because the motorcycle involved was reported stolen from Friendswood.  Palmire, who had a historically antagonistic relationship with Soffar,[15] testified that he leaned into the front window of the patrol car, advised Soffar of his rights, and at some point stated, "I've got you now, punk."

Once the wrecker had removed the motorcycle, Officer Willoughby drove Soffar to the League City Police Department for booking.  En route to the police station, Soffar was talkative.  He stated to Willoughby that he "wasn't going to jail for some little

---

[14]  *Miranda v. Arizona*, 86 S. Ct. 1602 (1966).

[15]  During a prior arrest of Soffar not long before the motorcycle theft arrest, Palmire had stated to Soffar that the next time he caught him, he'd put Soffar away for life as a habitual offender.

24

motorcycle theft" and that if he was going to jail it was going to be for bigger things, so they better check Houston.  He also stated that he had knowledge of the then-notorious bowling alley killings in Houston.[16]   Soffar also asked to talk to Bruce Clawson, a detective in the Galveston County Sheriff's Organized Crime Unit, because Soffar had been an informant for Clawson.   Officer Willoughby did not respond to any of Soffar's statements, other than to say that he would see if they could get Clawson over to see him.

When they arrived at the League City Police Department, Willoughby took Soffar to the booking room and began processing the paperwork for the auto theft arrest.   Willoughby informed his supervisor, Lieutenant Steve Johnson, of Soffar's "bigger things in Houston" comment.   Lieutenant Johnson immediately notified the Houston police, and because he was aware that Bruce Clawson had an extensive relationship with Soffar and would be helpful in getting Soffar to talk with Houston detectives, he called Galveston County Sheriff's Office in order to have Clawson report to League City.[17]

---

[16]   In a letter later written to his counsel regarding the charges pending against him, Soffar stated that he was willing to tell the police that the composite drawing he had seen on the television looked like his running buddy, Latt Bloomfield, in order to get even with Latt for allegedly stealing some of his mother's silver and to hopefully help get himself out of trouble on the stolen motorcycle charge.

[17]   On another previous occasion, Lieutenant Johnson had agreed, at Clawson's request on Soffar's behalf, to talk to a judge about a ticket Soffar had received in League City.  This formed the basis of Johnson's knowledge regarding the special relationship between

Lieutenant Johnson stated, "I believed that Max trusted Bruce . . . and would talk to other officers attempting to interrogate him if Bruce were present." Houston police officers, together with an Assistant District Attorney, Terry Wilson, quickly came to the League City Police Department to interrogate Soffar, and Clawson showed up shortly thereafter. Before Clawson arrived, Soffar was taken to Lieutenant Johnson's office and was questioned by Johnson and some of the other officers. By the time Clawson arrived at 9:45 a.m., Soffar was in a holding cell.

### ii.  Enter Bruce Clawson

Sergeant Bruce Clawson, at that time an undercover detective in the Organized Crime Task Force of the Galveston County Sheriff's Office, stated that he was summoned by Lieutenant Johnson to be a "friendly face" for Soffar in the sense that he would "hold Soffar's hand," in an effort to convince him that "he should talk to the Houston detectives." Clawson was asked to find out what Soffar knew and to "get him to talk." His activity log for August 5, 1980, which he used to account for where he traveled in a particular day, reflected his notation that "Soffar refused to talk, so Lt. Johnson called me [to League City]." According to Clawson's affidavit filed in the state habeas court, "Max definitely trusted me and thought of me as a friend. All in all, I was used to get Max to talk."

_____

Soffar and Clawson.

26

The friendship between Soffar and Clawson was not a two way street. Clawson stated that "Max might have considered me a friend but I didn't consider him a friend . . . my primary job as a police officer was to get Max to talk." Clawson had gained Soffar's trust over a substantial period of time during which Clawson would use Soffar as an informant to assist in arranging undercover drug purchases. Soffar had a history, not just with Clawson, but with the entire Friendswood Police Department and that history involved his hanging around the station house on a regular basis trying to befriend the officers.[18] Of his police officer relationships, Soffar considered Clawson to be his best police friend.

On August 5, 1980, at approximately 9:45 a.m., Clawson arrived at the League City Police Department, found Soffar in a holding

[18] Most of the officers at the Friendswood Police Department described Soffar as a "puppy dog" who was always around and under foot. Universally, they regarded him as being brain damaged from drug abuse and unable to think much farther ahead than the present day. Soffar was described as eager to please and eager to get along with the police. Mike Clawson, a police officer and brother of Bruce Clawson, stated in his affidavit that Max Soffar, who was very often in trouble with the law, also had a reputation for confessing to crimes he did not commit either for attention or to get himself out of trouble on unrelated charges. Mike and Bruce Clawson both agreed that "Max knew how to trade information for something he wanted," and that he knew how to read between the lines in answering questions to tell officers what they wanted to hear. Mike Clawson testified that if you let on about unknown details of a crime, Soffar would adopt the details and repeat them back as part of his statement. As an example of how Soffar was easily led into telling police what they needed to hear, he recalled how during an investigation into an auto theft Soffar committed, in which Soffar could not account for how he got the keys, Mike Clawson asked Soffar whether he got the keys off of the table or out of the owner's jacket pocket. Soffar responded, "off the table," and he signed a confession to that effect.

cell, and had a brief conversation with him.  Shortly thereafter, Clawson accompanied Officer Willoughby and Lieutenant Johnson as they transported Soffar just up the street for an appearance before a magistrate judge on the motorcycle theft charge.  Clawson had suggested that Soffar be given his warnings by a judge.[19]  It is undisputed that at his appearance before the magistrate, Soffar was read each of his *Miranda* rights by the judge and signed a form acknowledging his understanding thereof.  Soffar was returned to the League City Police Department by 10:15 a.m.

Approximately fifteen minutes after returning from the magistrate, Clawson had a second conversation with Soffar at the beginning of which he recited the *Miranda* warnings to Soffar himself.  This conversation, which lasted approximately 30 minutes, occurred at the request of one of the numerous detectives who had

---

[19]    In his affidavit filed in the state habeas court, Bruce Clawson stated that his philosophy with regard to giving the *Miranda* warnings at that time that he did it right away because once a suspect had been given the warnings or "magistrated" he was "fair game."  Another of Clawson's philosophies was to "push the envelope" with respect to investigatory matters.  In his affidavit, Clawson specifically stated that, with respect to using informants like Soffar as tools:

> My philosophy as a cop was that it was a war and that police officers, judges and defense lawyers had different roles to play.  My job as a police officer was to fight the war with all tools at my disposal and to do so right up to the line of what the courts permit.  I agreed with the philosophy of a statement attributed to [Assistant District Attorney] Terry Wilson that "you can't try the admissibility of a piece of evidence that you don't seize."  If I went too far, that was up to the judge to correct.  The judge had his job to do and he would do it.

28

questioned Soffar immediately after he was returned from the magistrate. According to Clawson, his job was "to go down and hold Max's hand." The conversation began with a joke to put Soffar at ease and continued with light discussion of the stolen motorcycle charge Soffar had been arrested on. They also discussed briefly the bowling alley offense and Soffar mentioned Latt Bloomfield, an individual known to Clawson as the son of a Houston detective whom Soffar had frequently run around with committing petty crimes and small robberies, and whom had a wide-spread reputation for violence. Soffar then told Clawson that he did not like, and did not want to have to talk to either Officer Palmire or the Assistant District Attorney, Terry Wilson.

In this second conversation, Clawson informed Soffar that the bowling alley offense was serious and that, while he did not know what the minimum would be for such a crime, he knew the maximum could be death. He told Soffar that "there is no way this is going to be easy." Soffar ultimately agreed to talk to Houston police detective Gil Schultz, whom Clawson introduced to Soffar. Clawson remained in the room for the first 10 to 15 minutes of Schultz's interrogation.

According to his state habeas testimony, Clawson observed Schultz hand Soffar a piece of paper and ask him to draw a map of the bowling alley. Soffar drew a rectangle, but was unable to provide much detail. After that, Clawson stated that Schultz and Soffar both participated in marking the finer details of the

building. His recollection was that Shultz added the details regarding the turnaround between the inbound and outbound lanes of the highway and the fact that there were two entrances to the bowling alley, and that Soffar had no knowledge of either the turnaround or the fact that each side of the highway was a one-way feeder-type road. Clawson also stated that Soffar was apparently unable to properly identify which side of the Northwest Freeway the bowling alley was on, and that Schultz drew the control counter on the diagram for him. It was Clawson's opinion that Soffar had no knowledge of the bowling alley's location because he was completely unable to draw the map.[20] Shortly after observing the attempts to

---

[20] In his affidavit, Bruce Clawson stated that he had no confidence in what Soffar was relaying to Schultz and that he considered Soffar's account to be nothing more than a "bill of goods." He refrained from intervening, however, because "it was a Houston, not a Galveston, case and it would have been bad form for me to intrude myself in the interrogation." Yet, Clawson was so disturbed and concerned that Soffar might be setting himself up to falsely confess to a crime, that he decided to voice his concerns. In his affidavit he went on to state:

> Nonetheless, I subsequently got into a heated argument with Detective Schulz [sic] in the hallway, in which I forcefully told him all of my concerns and my doubts about the truth of what Max was saying. He was unmoved. I also raised all these matters with Terry Wilson. He told me not to worry about it.

Mike Clawson expressed similar concerns to the State's prosecutor, Andy Tobias. In his affidavit, Mike Clawson recalled:

> I told Mr. Tobias what my worries were. I was quite emphatic. I remember I said that if all they were relying on was statements from Max without unmistakable corroborating evidence then I would definitely doubt that Max was involved.

draw a map, Clawson left Schultz alone with Soffar.

Clawson remained at the League City Police Department, and 30 to 45 minutes after he had left Soffar alone with Shultz for interrogation, Schultz emerged from the interview room and told Clawson that he had "hit a brick wall" and that Soffar was refusing to talk again. Schultz asked Clawson to talk to Soffar again so as to "reassure him and communicate to him that he should talk to the Houston detective."

Clawson then went in to speak with Soffar again privately. This third conversation lasted approximately 45 minutes and is by far, the most critical dialogue relevant to our disposition of this appeal.[21] Soffar was more nervous when Clawson went back in to see

Neither Bruce nor Mike Clawson was contacted by Soffar's trial counsel, though Mike Clawson fully expected to be. In his affidavit, Mike Clawson stated:

> Given the questions I raised with Mr. Tobias I was not surprised that the State did not call me as a witness. I was surprised, however, that Max's defense lawyers did not contact me or, to the best of my knowledge, anyone else in the local community, law enforcement or otherwise. Folks knew what kind of a person [Soffar] was and what his problems were. In my experience, the defense attorneys' failure to talk to any of us in this situation is inexplicable.

[21] We note here that the only testimony about this conversation came from Bruce Clawson himself and his testimony is undisputed. Like the great majority of the questioning of Soffar, no tape recording or transcription of this private conversation was made, and thus only Max Soffar and Bruce Clawson know what was said. Clawson's brother, Mike Clawson, did enter the room during Bruce Clawson's and Soffar's private conversation to bring them lunch. Bruce Clawson had called his brother, a police officer in Alvin, Texas, which is located in Brazoria County, who came in an effort to get information on several stolen vehicles from his

him.   Clawson first engaged Soffar in some preliminary small talk and then asked, "what's the problem?" or words to that effect. Soffar responded with a question of his own.  According to Clawson, Soffar asked whether he should get an attorney or talk to the detective.   Regarding Soffar's inquiry about getting a lawyer, Clawson stated in his State habeas affidavit:

> That [question] prompted a crisis of conscience on my part.   I understood Max to be asking my advice as a friend.   However, my job as a police officer was to get Max to talk. . . . [T]he Houston police were extremely interested in pursuing this lead to the maximum and [] they expected me to get Max to talk, and not to derail their investigation by advising the only lead to consult a lawyer.
>
> Because of this crisis of conscience, I replied to Max's question by asking him whether he was asking me as a cop or as Bruce.  Max didn't appear to understand what I meant.   I then told Max the detectives were serious and that the maximum penalty for the bowling alley killings was death. Max again did not seem to appreciate what I was saying.  He asked me again what I should do, talk to the detective or get a lawyer.
>
> At this point, I had done all I could do as Max's friend, to alert him to how serious things were. My obligation as a police officer was to keep Max talking.   Although I do not recall my precise words, I told Max that if he was involved in the crime he should tell the detective he was in it; otherwise, he should get a lawyer.
>
> Max then asked me how he could get a lawyer.   I asked Max if he could afford to hire a lawyer on his own.  Max laughed at this because I knew, and he knew I knew, that he did not have any money to hire a lawyer on his own.

jurisdiction.  By all accounts, Mike Clawson was in the room for only a few brief moments and did not witness any of the substantive discussions regarding Soffar's inquiries about a lawyer.

> Then Max asked me how he could get a court-appointed lawyer and when he could get one. I told him that I didn't know Harris County procedures and that it could take as little as a day or as long as month.
>
> Max responded by spitting in the trash can and saying "so you're telling me I'm on my own." I did not respond to or disagree with this statement;[22] Max had already been given his rights by the judge.[23]
>
> I asked Max if he would talk to the cops. Max said that he would.

Clawson confirmed the sequence of his and Soffar's dialogue in this colloquy during his re-direct testimony at the state habeas evidentiary hearing. As a result of this colloquy, Soffar started speaking again with the investigating detectives, and over the course of three days of on-and-off interrogation, he gave three written statements implicating himself and Latt Bloomfield in the bowling alley robbery-murders.

### iii. Clawson's Precise and Concise Trial Testimony- Half the Picture

Despite all of the foregoing, Bruce Clawson initially made a strong witness for the State. Both in his testimony at the *Jackson*

---

[22] Clawson elaborated on this point during his state habeas testimony that in response to Soffar's statement "I guess I'm on my own," he replied affirmatively "yes, you are."

[23] This statement was consistent with Clawson's philosophy of giving the *Miranda* warnings right away or having the suspect "magistrated" right away, so that once given, a suspect would be "fair game." *See supra* note 19.

*v. Denno* hearing[24] on the admissibility of Soffar's written statements and at the trial itself, Clawson answered only the questions put to him by the prosecuting attorney Andy Tobias without elaboration.  In short, his testimony at these hearings was technically accurate, but it was not the whole truth.  No information regarding Soffar's questions about getting a lawyer was presented to the jury.  Clawson answered only the narrow question put to him, "did Soffar ask for an attorney?"  His response was that "no, Soffar did not ask me for an attorney."  And when asked if Soffar had any questions about his rights, Clawson stuck to an understanding he had with the prosecutor to narrowly interpret that question as relating only to the period of time immediately following the reading of his *Miranda* rights.  His response was "no, he did not have any questions about his rights [then]."

The nutshell of his trial testimony was that he was called to help put Soffar at ease and to be a friendly face for him because of their prior relationship.  He testified that he read Soffar his *Miranda* warnings, that he did not coerce or threaten Soffar, and that neither did any other officer.  He said he told Soffar that the bowling alley offense was serious and that the maximum penalty was death.  He accompanied the other officers when they took Soffar to the magistrate judge to have his warnings read to him.  He

---

[24] *See* **Jackson v. Denno**, 84 S Ct. 1774, 1781 (1964) (a defendant has a right "to have a fair hearing and a reliable determination on the issue of voluntariness [of his statement].").

testified that Soffar's refusal to talk was a refusal to talk with particular officers, namely Palmire and Assistant District Attorney Terry Wilson.

As a result of painting his testimony with such a narrow brush, no information regarding Soffar's subsequent questions about his right to have an attorney made it to the judge ruling on the admissibility of Soffar's subsequently obtained written statements nor to the jury. Clawson, without question, technically provided accurate responses to the questions put to him, but he kept substantial other parts of the picture to himself, and from the jury, because he was not specifically asked.

### iv. Clawson's Habeas Testimony- A Different Picture

The repressed portions of the truth regarding Clawson's dialogue with Soffar finally saw the light of day when Clawson was interviewed by Soffar's habeas counsel and executed his affidavit, which was filed with the state habeas court. Using the broader brush of telling the whole truth, Bruce Clawson painted a very different picture of his dealings with Soffar than the one which was exhibited at the suppression hearing and trial. In very candid detail, Clawson's undisputed affidavit account of his private conversation with Soffar portrays a previously undeveloped scene in which Soffar specifically inquired about his right to have counsel present to assist him in dealing with the interrogating homicide detectives from Houston.

35

The following is a summary of the pertinent information added to Clawson's previous testimony through his undisputed affidavit and state habeas evidentiary hearing testimony. Clawson acknowledged regret over not responding differently to the questions Soffar asked. Indeed, he noted that he no longer responds to questions from suspects about whether they should talk to a lawyer with the standard response he used then, which was "if you are guilty talk to the police, if you are innocent then talk to a lawyer." Instead, he quickly and firmly advises any suspect who asks him that when dealing with the police you should have a lawyer and that if you've been arrested, you "darn sure" better have a lawyer. By his own account, at least with respect to answering these types of questions, Clawson has abandoned the "push-the-envelope" philosophy he subscribed to at the time he talked with Soffar on August 5, 1980.

Clawson also explained in the habeas proceedings that at the time of his talk with Soffar, he felt pressure from the Houston detectives not to screw up and "derail their investigation" by having their only solid lead ask for counsel, and that he suspected that the detectives did not want him to interfere in their investigation.[25] As a result of this pressure, Clawson testified

---

[25] His suspicions were confirmed when he expressed concerns about whether Soffar knew anything about the bowling alley murders to Detective Schultz and Assistant District Attorney Terry Wilson. He stated that Schultz was "unmoved" by his concerns and that Wilson responded to those concerns by telling him "not to worry about it."

that he "derailed [Soffar's] inquiries about the subject of obtaining a lawyer," and that he "took steps to keep Max talking instead of seeking to slow things down for him so that he could understand what was happening." Specifically, Clawson knew that Soffar did not have enough money to retain private counsel when he implied to Soffar that he would have to pay for his own attorney if he wanted one. Clawson testified that he also knew about Houston's 72-hour rule under which a suspect had to be either charged or released within 72 hours of arrest. Finally, Clawson knew that Soffar could demand that all questioning stop until he could get an attorney and that Soffar did not have to be "on his own" when Clawson responded "yes, you are" to Soffar's question, "so, I guess I'm on my own?"

With respect to Clawson's relationship with, and history of dealing with Soffar, Clawson acknowledged that given Soffar's mental limitations and tendency to talk himself into trouble in order to gain police favor or to get out of trouble for an unrelated offense, he thought that Soffar was especially in need of an attorney to help him deal with the detectives investigating the bowling alley murders. Notwithstanding this special knowledge, Clawson explained that at the time, as a result of the pressure put on him by the Houston detectives to "get Max to talk," he was dealing with Soffar "as a police officer" and not as his friend. And Clawson acknowledged both that Soffar was seeking his advice as a friend, and that he knew based on the nature of that relationship

37

that Soffar would "follow his lead."

In the state habeas proceedings, Clawson was also very candid about his conscious effort to narrow the scope of his testimony at the *Jackson v. Denno* hearing and at trial. He acknowledged construing questions narrowly and answering them literally, without elaboration. In his state habeas testimony, Clawson stuck by his answers at the trial, stating that he would answer the same narrow question, "did Soffar ask for a lawyer?," the same literal way today, i.e., "no, he did not `ask for' a lawyer."[26] In his State habeas testimony he reiterated, "I was asked [at trial] if Max Soffar asked for an attorney and my answer was no he did not ask for an attorney and still would be no he did not ask for an attorney."

The most crucial addition to Clawson's prior testimony came during Soffar's habeas counsel James Schropp's re-direct examination of Clawson at the state habeas evidentiary hearing. The relevant colloquy begins with a question from Schropp:

> Q.  Did you draw any . . . conclusions based on everything you heard and observed from Max and everything you observed with regard to his situation . . . . What did you conclude that Max

---

[26] His defense of and efforts to reconcile his previous trial testimony with the new information presented in the habeas proceedings was likely the result of the fact that on cross-examination at the state habeas evidentiary hearing, counsel for the State made specific reference to Section 37.03 of the Texas Penal Code, implying that if he [Clawson] were to testify differently than he had at the trial or the *Jackson v. Denno* hearing, he might be admitting to aggravated perjury.

38

wanted at that point?

A. What did I conclude?

Q. Yes.

[Assistant State's Attorney] FLEMING: If anything, Your Honor, if he wanted anything.

THE COURT: Yeah, if he did.

A. Well the obvious answer is he wanted an attorney.

MR. SCHROPP: That's the obvious answer. Thank you sir.

QUESTIONS BY MS. FLEMING:
Officer Clawson that seems a bit inconsistent with what you -

MR. SCHROPP: I'm sorry I'm not finished.

MS. FLEMING: I apologize.

MR. SCHROPP: That's okay.

THE COURT: That's your answer now right sir. You said that's the obvious answer is that he wanted an attorney?

WITNESS: Yes sir within the context of his question yes, sir.

When asked by Ms. Fleming shortly after this colloquy if he was "a little confused now," Clawson responded, "not as much confused as slightly disappointed in myself for not doing things differently."


**D. Interrogation and the First Three Written Statements**

With Clawson having insured that Soffar would be willing to talk to the investigators without invoking his right to counsel,

39

the detectives resumed interrogation of Soffar.  Over a period of

three days following his arrest on the stolen motorcycle charge,

while he was in custody and without counsel present, Soffar would

sign three written statements, prepared by detectives, in which he

implicated himself and Latt Bloomfield in the bowling alley

robbery-murders.

### i.  *August 5, 1980 - The First Statement*

After Clawson's efforts to get Soffar to continue talking were

successful, Detective Schultz interrogated Soffar for an additional

two hours.[27]  At 3:30 p.m. on August 5, 1980, Soffar signed a

written statement prepared by Detective Schultz.  The statement was

identified as State's Exhibit 108, and while not introduced into

evidence by the State, it was used against Soffar during the guilt

phase of his capital murder trial.  In this first statement, Soffar

stated the following.  He and Latt Bloomfield went to the bowling

alley one night in the first part of July and he entered through a

side door and checked the cash drawer.  Latt asked him to return

the next night with his pistol, but he told Latt he wasn't going to

do it.  He did, however, later agree to drive Latt to the bowling

alley and wait outside.  While he waited in the car outside the

front door, he saw Latt move some people around and he heard two

---

[27]  Soffar was also questioned for approximately 20 minutes by
Assistant District Attorney Terry Wilson, and only this brief
interview was tape recorded that day.  Neither a cassette tape nor
a transcript of this brief interview with Wilson is contained in
the record before us.

40

shots when Latt was out of his sight.  He then saw Latt make some people get on their knees.  As he moved the car forward, he heard another shot and then two more shots.  He stated that Latt told him that someone pulled a gun on him.  They then went to Galveston where Latt robbed a U-Totem convenience store and they bought some drugs.

After giving this first written statement, Soffar was transported to Houston police headquarters, where he spent an additional 3 hours with Houston police officers before he was transported to the jail at approximately 7:43 p.m.

### ii.  *August 6, 1980 - The Second Statement*

Beginning shortly after 9:00 a.m. the morning of August 6, 1980, Detective Kenny Williamson mirandized and interrogated Soffar for approximately 50 minutes in a tape-recorded conversation during which Soffar relayed more details of the same basic scenario, i.e., that he drove to the bowling alley and that Latt did the robbery and shootings alone.[28]  At approximately 10:00 a.m., Soffar was taken to a line-up arranged for surviving witness Greg Garner's viewing.  Garner failed to positively identify Soffar.[29]  Soffar was

---

[28]  While neither a cassette tape or a transcript of this conversation is contained in our record, the record does reflect that during Williamson's interrogation, he drew a map for Soffar including significant details, and that the map was then adopted by Soffar.

[29]  Garner was also unable to positively identify Latt Bloomfield, who had been arrested and brought to Houston police headquarters and placed in a line-up.  We pause here to note also that a search warrant executed on Bloomfield's residence and car

41

then mirandized and interrogated again by Detective Williamson and another detective, J. W. Ladd, for approximately 1 hour and 15 minutes before giving his second statement.[30]

At 2:44 p.m. on August 6, 1980, Soffar signed the second written statement prepared by Detective Ladd. This statement was identified as State's Exhibit 109. As with State's Exhibit 108, the second statement was not introduced into evidence by the State, but was used against Soffar during the guilt phase of his capital murder trial. In his second statement, Soffar told the same basic story as he had in his first statement, adding the following details. The night before the robbery-murders, it was Soffar who kicked in the glass side door of the bowling alley to commit the burglary.[31] The next day, Latt picked him up at 1:00 p.m. and they hung out together for the afternoon. That evening they drove back to the bowling alley at 9:00 p.m., but since there were a lot of people there, they just parked the car and drank beer until most everyone had left. Again, Soffar stated that he pulled the car up

---

yielded no evidence linking him to the bowling alley robbery-murders. Similarly, a search warrant executed on Soffar's residence failed to produce any evidence of Soffar's involvement.

[30] This conversation, like virtually all others with Soffar was neither tape recorded nor transcribed. Instead, the substance of these interrogation sessions was summarized by detectives and presented to Soffar in the form of written statements for his signature.

[31] The police obviously knew this was not true because they had previously arrested the four youthful perpetrators of the burglary which Soffar now claimed that he and Latt Bloomfield committed.

42

in front of the doors while Latt went inside of an unlocked front door. Latt was approached by two people and then another, and he made these three lie down on the floor right in front of the door. Latt motioned someone else to come over and then Soffar heard the first shot. He could see the feet of the people on the floor. He then heard another and then several other shots. Latt came running out of the bowling alley with the gun in one hand and the lady's stocking he had put over his face when he went in the other hand. Latt told him that someone pulled a gun on him so he "did what he had to do." Soffar added that they went to buy drugs that night from an individual named "Pops," and that several weeks after the robbery-murders Soffar told Pops about the "deal at the bowling alley." He asked Pops "if he heard about it and that Latt and I had done it."

At some point after signing his second statement at 2:44 p.m., Soffar was visited by, and he spoke privately with: his mother, Zelda Soffar; his uncle, Carl Lander; and his aunt, Celia Nathan.[32] Ms. Nathan informed Detective Ladd that the family was in agreement that Max should cooperate with the police. At approximately 4:00 p.m., Detectives Williamson and Ladd checked Soffar out of the jail and took him in a patrol car to the crime scene. They pulled into the parking lot, but did not go inside of the bowling alley. At

---

[32] Celia Nathan was also an attorney who had represented the Soffars when they had Max Soffar committed to a Texas state mental hospital in Max's pre-teen years.

approximately 5:30 p.m., the detectives drove Soffar to an area south of Houston where he took them to the individual named "Pops," from whom he and Latt had allegedly purchased drugs the night of the robbery-murders. Pops was identified as an individual by the name of Lawrence Bryant. At approximately 7:30 p.m., the detectives then took Soffar to Galveston where Soffar pointed out a convenience store Latt had allegedly robbed. Soffar was checked back into the jail at 10:55 p.m.[33]

During the time Soffar was riding around with Detectives Williamson and Ladd, the police released Latt Bloomfield from custody, citing a lack of any corroborating evidence to justify charging him in the robbery-murders.

### iii.  August 7, 1980 - The Third Statement

Beginning at approximately 8:42 a.m. the morning of August 7, 1980, Detectives Tom Ladd[34] and Ted Thomas interrogated Soffar for approximately two and one-half hours. Soffar was also briefly interrogated that morning by Detective Williamson. That afternoon, a felony capital murder complaint was filed against Soffar alleging that he intentionally caused the death of Arden Alane Felsher while

---

[33]  In a letter written to one of Soffar's appointed trial counsel, Joe Cannon, which is discussed *infra* at Part I.F.iii., Soffar alleged that during this drive around town, the detectives became forceful with him and told him that Garner had picked him out of the line-up, so he "might as well say [he] did it and get a life sentence."

[34]  Detective Tom Ladd is the brother of Detective J. W. "Jim" Ladd.

in the course of committing or attempting to commit the armed robbery of Stephen Allen Sims.

Upset because he had learned that Latt Bloomfield had been released and because he thought that he was going to be charged with all three murders alone, Soffar contacted a family member and asked them to have detectives come and see him at the jail. At approximately 7:30 p.m. that evening, Detectives Ladd and Williamson came to see Soffar again. Soffar inquired as to why Bloomfield had been released and the detectives responded that they did not yet have enough evidence on Bloomfield to either hold or charge him. Detective Ladd then began actively interrogating Soffar for another 30 minutes before beginning to take and prepare Soffar's third statement.

At 9:25 p.m. on August 6, 1980, Soffar signed the third written statement prepared by Detective J. W. Ladd. This statement, identified as State's Exhibit 110, was introduced into evidence by the State, and used against Soffar during the guilt phase of his capital murder trial. The entire text of Soffar's third statement reads as follows:[35]

> My name is Max Soffar. I have been in jail since Tuesday morning for this bowling alley deal. I gave two previous statements, one to detective Schultz and one to detective Ladd. I didn't tell the whole truth in those statements and want to now so that I don't take this whole thing by myself.

---

[35] This statement is reproduced exactly as prepared. All scrivener's errors and omissions are contained in the original.

One thing that I didn't tell the truth on was that Lat Bloomfield and I did this thing when we first got to the bowling alley, not like I said about being there in the parking lot for awhile. Lat drove in and we were in his brown thunderbird. Lat pulled right to the front door so that the passenger side was next to the bowling alley. I think that there was a couple of cars in the parking lot when Lat pulled to the door. Lat pulled a stocking over his hair so that his hair would be pulled back. I pulled up my t-shirt over my nose and mouth. Lat had his 357 revolver which I think is an R-G model. This gun had about a three inch barrel. He had the gun under his shirt when we walked in a guy asked what we were doing. Lat pulled the revolver and stuck it in this guys face and said, "This is a robbery." Lat pulled this guy by the hair and made him get down on his knees and xx walked up. This was two dudes and a girl. Lat told them to get on the floor and if they didn't do what he told them that he would shoot this first guy who was already on the floor. They got down on their knees away from the counter and Lat made them come back closer to the control counter and they did. They were laying from the door so that there was a dude and then a girl and then another dude and then the last dude. The second dude was trying to look up and Lat told him not to be looking and to turn around and lay facing the way all the others were. He then turned around so that they were all facing back towards the snack bar. The second dude kept looking around so Lat fired a warning shot into the floor. The girl screamed and then Lat told her to shut up and she kept screaming. Lat kicked the girl in the back and then the second dude who was the one who kept looking up started to raise up. He was about half way up when Lat shot him in the back of the head. Then Lat just turned around and shot the third dude. This third dude was the first one Lat grabbed and made get on the floor. He shot him the same way as the first one that he shot. Lat threw me the gun and told me to shoot the other two. I hesitated and then he said, "Shoot them now." I aimed the gun and the other guy who was still left who was closest to the door and fired one time. I hit him in the back of the head behind the ear. I walked around the other side of them and heasitated [sic] and Lat said, "Shoot her." She had her face

46

down and she just looked up at me and I aimed and turned my head and shot her. I think I hit her in the cheek. I had the gun and ran around and looked in the cash register over by where you get the shoes. I got all the bills and a little of the change and then went to the office but the door was locked. I went over to the cash register by the snack bar and took bills out of it too. I put the money in my pockets. I went back by the office and tried to force the door open but I couldn't get it opened. Lat was looking under the counter for a money bag and I think he got 50 or 60 dollars. We walked over by the office and I told him I thought I saw some headlights. I went outside but I didn't see anyone so when I came back in Lat was rumageing [sic] through their pockets and took the wallets out of their pockets. He took the money and I think that he kept the wallets. We looked around to make sure that nobody was looking and we didn't see anybody. I asked him if he wanted to check in the back and he said no. So, we looked in the bathrooms making sure no body was in there. Then we left. I still had the gun. Lat drove and we had the windows down to his car. He made a right on the highway and drove down for a little bit and then turned around and came back past the bowling alley. I asked him why he shot the dudes and he said he shot the dude for raising up and playing hero. He said he made me shoot the other two so that I would be as guilty as him if we got caught. I put the gun under the front seat after I reloaded it and it only had one live bullet in it before reloading. I don't know where the gun is now. The last time I saw the gun was I believe last Saturday night and Lat had it at that time. We went to score some pills and got 24 pills over at the dope house. These were preludins. After the gas and pills I got 95 dollars out of the deal and I think Lat got a lot more. We went to my house and did some preludin and Lat said he was afraid someone had seen his car so he went and took it home. He walked back over to my house that night and we did the rest of the pills. We stayed up all day and went out to the park the next day. I was scared and that is the reason that I did not tell the whole truth before and I feel like shit and feel bad about what happened and ought to take my punishment for it. I think Lat and me both ought

47

to pay for what we did.[36]

In addition to his written statement, Soffar drew a diagram of the positions of the victims at the time of the shootings. In the diagram, Soffar depicted the four victims lying parallel to one another with their feet aligned along the edge of the control booth. This diagram was not introduced into evidence during Soffar's capital murder trial, but was admitted into evidence by the state habeas court. It is attached to this opinion as Appendix "C".[37]

### E. Inconsistencies Between Garner's and Soffar's Accounts

As a factual matter we pause here briefly to note that when juxtaposed, Greg Garner's and Max Soffar's accounts of the robbery-murders appear dramatically at odds with one another. The numerous fundamental factual inconsistencies between these two versions of events are both obvious and striking. The most noteworthy discrepancies between Garner's interviews with detectives and Soffar's third written statement are summarized in table format in Appendix "A" to this opinion. This appendix is followed by

---

[36] We note, as did the Texas Court of Criminal Appeals, that neither this third statement nor either of the two previous statements, set out "the date, county, city, state, nation, street address or name of the bowling alley, the name of any victim, or any other fact which might expressly reflect that appellant's statement relates to the offense for which he was tried, convicted, and given the death sentence." *Soffar v. State*, 742 S.W.2d at 375.

[37] The witness signatures at the bottom left side of the diagram belong to Houston detectives R. D. Cain and Miland Kardatzke.

48

Garner's diagram of the victims' positions at the time of the shootings (Appendix "B"), which also differs dramatically from Soffar's diagram of the victims' positions (Appendix "C").

We also note that the physical evidence in this case supports Garner's account of events more than Soffar's third statement. With respect to the forensic and ballistics evidence, as discussed *supra*, the bullet holes found in the carpeting of the bowling alley are consistent with the body configuration recalled by Garner, that is, with him lying between Sims and Temple where he was shot. There is no physical evidence to support Soffar's account of Garner having been shot lying between the front door and Felsher. In fact, the only unmatched bullet hole, which could represent the final resting point of the bullet exiting just beneath Garner's left eye, is the one between Sims and Temple. Also with respect to body configuration, the photographs of the crime scene depict the bodies aligned, not parallel to one another along the edge of the counter as depicted in Soffar's account, *see* Appendix "C", but in a semi-circular configuration nearly identical to that depicted by Garner in his diagram, *see* Appendix "B". Indeed, the photographs show a large vacant space between the bodies of Sims and Temple where, according to Garner, he would have been lying when shot.

With respect to Garner's account of how the perpetrator gained access to the bowling alley by feigning car trouble, a passerby to the bowling alley, who was never called as a witness by the State,

told the police that at approximately 11:50 p.m., he passed the bowling alley and slowed down because he was looking for a place to purchase cigarettes, and that he saw a car parked directly in front of the bowling alley with its hood up. This individual saw just one person walking from that car toward the front entrance of the bowling alley. Additionally, one of the police photographs of the crime scene showed that there was a white plastic water jug like the one described by Garner as belonging to the robber located on the control booth counter.[38]

### F. Appointment of Counsel and Pre-trial Developments

On August 8, 1980, the day after Soffar gave his third written statement, Soffar made his preliminary initial appearance on the felony capital murder charge before the 232nd Judicial District Court of Harris County, Texas. During this appearance, the state court appointed Frederick "Rick" Stover and Joseph "Joe" Cannon to represent Soffar because of his indigence. These attorneys, who were present in the courtroom to accept their appointment, were advised that their client had already signed three written statements implicating himself in the charged offense. Immediately after accepting their appointment, defense counsel instructed the

---

[38] The police overlooked the water jug and did not dust it for fingerprints. The next morning, the bowling alley cleaning crew recalled seeing it, but removed it and washed it because they thought it was used by investigators to clean up fingerprinting dust.

State's attorney that their client was not to be interrogated regarding pending charges or any other matters unless they were notified and provided an opportunity to be present.

### i. August 19, 1980 – The Fourth Written Statement

Notwithstanding defense counsel's instruction to the State's attorney not to interrogate Soffar without notification, on August 19, 1980, Harris County Sheriff's detective Earl Bockel removed Soffar from his cell in the Harris County jail and interrogated him. Bockel testified that he received information from Houston homicide detective Jim Ladd on August 15, 1980 that "during a homicide investigation," Soffar had admitted to raping a girl in the Friendswood area sometime around December of the previous year, 1979.[39] Bockel checked into the unsolved rape files in Friendswood and determined that a young woman by the name of Caroline Knight had been raped on September 23, 1979 in Friendswood.[40] Bockel then

---

[39] We note that the information regarding this rape was obtained by Detective Jim Ladd "when he took a confession statement from Max Soffar." Without question, had Max Soffar never been interrogated by Detective Ladd regarding the bowling alley murders on August 6 and 7, Soffar's contemporaneous admission to raping a girl in Friendswood would never have occurred. Likewise, Detective Bockel's subsequent investigation, which ultimately yielded a confession to the rape, would never have occurred. Thus, but for Ladd's interrogation of Soffar on August 6-7, prior to his appointment of counsel, Soffar's participation in the rape would not have been discovered.

[40] In her statement following the rape, Caroline Knight described in detail the events of that evening, most notably that her assailant told her that he had killed three other women and that she was going to be the fourth, and that as he raped her he continued to stab a knife into the ground above her head.

contacted Ms. Knight and informed her that they had caught someone who confessed to the rape. He went to her workplace and showed her a photo spread containing Max Soffar's and five other individuals' pictures. Ms. Knight stated that two of the photos, one being Soffar, looked familiar, but that she was unable to make a positive identification.

On August 19, 1980, Detective Bockel visited Soffar at the Houston jail and interrogated him regarding the rape. According to Bockel, he read Soffar his rights and Soffar said that he understood his rights and did not want his appointed lawyers present.[41] As a result of this interview, Soffar signed a fourth written statement implicating himself in the rape of Caroline Knight.

On August 28, 1980, the State's prosecutor, Andy Tobias, requested that Detective Bockel arrange for a line-up to be scheduled on August 30, 1980. Defense counsel was notified and the line-up was assembled that morning at 9:45 a.m. Though Ms. Knight again thought Soffar looked familiar, she was unable to make a positive identification. According to Bockel's report following the line-up, "[u]pon the request of Assistant District Attorney Andy Tobias, this case is being referred directly to him without charges." Accordingly, Bockel indicated that the rape case was

_____

[41] It appears from the record, that at the time of this interview, some ten days following appointment of counsel, neither Stover nor Cannon had yet been to visit Soffar in the jail.

"cleared due to charges filed in other [capital murder] cases," and Soffar was never indicted for the rape of Caroline Knight.

During the penalty phase of Soffar's murder trial, having twice been told that the police had caught someone who confessed to raping her, Caroline Knight made an in-court identification of Soffar as her assailant. During her testimony she recounted how Soffar stated that he had killed three other women before and that she was scared when he said that.[42]

### ii. *Additional Interrogation*

When one of Soffar's defense counsel made his first trip to the Harris County jail to interview Soffar on August 21, 1980, he was informed that he could not see Soffar just then because Soffar was "being interviewed by a Mr. Armando Simon, an employee of the Harris County Sheriff's Office." The very next day, the 232nd District Court, upon motion, entered an injunction prohibiting the Houston Police Department, the Harris County District Attorney's

---

[42] However, in a subsequent affidavit filed in the state habeas proceedings, Ms. Knight stated:

> because I was not asked, however, I did not testify at the trial that, after the rape, my assailant told me that he had done a lot of bad things in his life but raping me was the worst thing he had ever done. He sounded very upset and sincere. I believed this statement at the time and thought he probably made his earlier statement about the three other women just to scare me.

Ms. Knight further affirmed that she would have testified to that fact if she had been contacted or asked by Soffar's trial counsel.

Office, and any other law enforcement agency from "questioning, interviewing, interrogating or in any manner attempting to gain information from the Defendant, MAX ALEXANDER SOFFAR, about any cases, whether charges have been filed or not, without first advising Mr. F.M. Stover or Mr. Joe Cannon . . . and giving them a reasonable opportunity to be present during the entire questioning, interviewing or interrogation . . . ."

### iii. Soffar's Letter to Counsel

At some point after first meeting Joe Cannon, Soffar wrote a letter to Cannon explaining his side of the story. In a handwritten letter, Soffar wrote[43]:

> This whole thing started when, this detective in Friendswood said he was going to lock me up cause I was a habitual criminal. His name is Mr. Palmary. He's busted me a few times and he does not like me. He told me next time I bust you for something bad I'm going to put you away for the rest of your life. Well anyway, he busted me the last time for false imprisonment. Me and a girl had an argument and she wanted to leave and I wouldn't let her. So someone called the police and he talked her or rather he therened her. She had a 38 snub nose pistol in her pocket when we were arrested, so he told her if she didn't file some charges on me for kidnapping or false imprisonment, that he would file on her for a concealed wepon. Then he comes in and says I got you now boy. So when I got arrested on that stolen bike I look up and who drives up, Mr. Palmary, and he's standing there with them lueague City police saying, I've got you now punk. So we go to lueague City Jail and I started thinking well Ill fix you smart ass and I told them I wanted to talk to bruce Clawson about

---

[43] This letter is reproduced exactly as penned by Soffar. All scrivener's errors and omissions are contained in the original.

the bowling alley.  I knew it would be hell on me if I said anything but at that point I didn't care.

I was already on a years probation out of galveston co. and I'm caught on  stolen bike.  By the way that bike had the licence plate on it from another bike I had stolen.  plus I had been on bond from an auto theft charge from Brazoria County.  plus I am holding pot and some stolen jewels.  So I told them that so palmary couldn't put his slimy hands on me. I told my sister when I saw that drawing of the killer, I told her it looked like latt.  he stole some silver from my house so I was going to tell the police he did it and get the reward, and get evan.  She told me not to do it so I didn't.  Then when I got pulled over and I see palmary standing their I decided to say I knew who did it.  Next thing I know them homicide detectives had me saying I did it.  the truth is I did not kill anyone. There is a lot more to this than I can write.  I will tell you the whole thing when I see you so you can check out my side of this to be sure yourself. Them police had me say what they wanted to hear. Did you know I took a polygraph test?  I was on acid when I took it.

The night before the robbery, their was a burgurly at this bowling alley.  I told the police the night before the robbery, I broke into the bowling alley. That was what I saw on the t.v. so I said in a statement, me and lat bloomfeild did the burgurly. When I told them I killed some girl, which was another lie, they asked me if I really broke in the night before.  I said no.  They asked me that quiestion about <u>100</u> times.  I put in a statement that I did.  But after they kept asking me that same question over and over I said no, just to see what he would say.  I did not put in a statement that I didn't brake in the bowling alley.  I said I did.  Then he told me I didn't do the burgurly cause they arrested some kids for it.  If I really did this why didn't I say I didn't brake in.  Cause that was what I saw on the news.  I thought the brake in was done by the same person or persons that did the robbery.

Me and 2 homicide police went out looking at bowling alleys.  They wanted me to point out the bowling alley we robbed.  They <u>were</u> <u>drinking</u>.  We

stopped 3 or 4 times for cokes for their mixed drinks! I asked them for some for my nerves and they said no. But they were drinking and that's when they started getting forceful. I made 2 more statements later that day. I will take a polygraph test to prove I'm not lying about the drinking or the force they used. They also told me that greg gardner picked me out so I might as well say I did it and get a life seentence. They also asked me why lat shot the girl in the face before I made the last 2 statements. I said in one of the statements that I did it. In the 3rd statement after they gave me a few details, I said I shot her, to get them off my back. I went thru more quiestions than I thought I would. After I went back to my cell after I gave the second statement I was so tired I just gave in to them.

The officers that were drinking was detective ladd and detective Williamson. They took me to galveston and to lamarge, to check out some robberys that I told them me and lat did. They all turned out to be lies. I admit that I did rape that girl in Alvin I told them I did. I told the Galveston County Sheriff I stole 2 motorcycles and I did. But I told them I shot the girl in this case. It's a lie. I knew I was in lots of trouble anyway, for all the other things I have done, that's why Im in the trouble Im in now.

### iv.  Additional Pre-trial Investigation

On August 21, 1980, after all of Soffar's confessions had been taken and the State had been enjoined from interacting with Soffar any further, the State submitted Garner to questioning under hypnosis. Presumably, the hypnotic interview was conducted in an effort to bolster the strength of the State's case against Soffar. However, in the end, Garner's account of events under hypnosis only served to confirm the version of events he had described in his initial interviews with investigators, and that version of events

56

differed dramatically from the version given by Soffar in his written statements. *See* Appendix "A". As a result, Garner's testimony at trial, if consistent with the statements made to investigators on July 17-20, 1980, would have served only to undermine the State's case against Soffar.

The State did not call Garner as a witness at Soffar's trial. Indeed, at trial, instead of calling Garner, the State called Dr. Gildonburg, the neurosurgeon who operated on Garner, during its case-in-chief. Dr. Gildonburg testified that Garner could be suffering from retrogressed amnesia and that Garner may have created a false memory of events. Dr. Gildonburg did not express any medical opinion that Garner was in fact suffering from amnesia. Additionally, we note that Soffar's trial counsel was informed by the State that Garner was a "vegetable" with no memory of the offense, and incredibly, based upon this assertion and the fact that Garner was not going to be called by the State as a witness, Soffar's trial counsel did not even attempt to interview Garner themselves. Rather amazingly, defense counsel instead chose to bolster Dr. Gildonburg's testimony by asking and receiving an affirmative response to the question, "would it be a fair statement . . . that a person that suffered the type of wounds that Greg Garner suffered, no one, including Greg Garner, himself, would ever know whether he was giving an accurate account of the events that

57

caused his injury?," thus implying to the jury that, indeed, Garner had no useful memory of the offense.[44]

## G.  The Trial

Beginning on March 16, 1981, Judge Van Stovall presided over Soffar's capital murder trial which, exclusive of nearly four weeks of voir dire and jury selection, lasted two and a half weeks.

### i.  Guilt Phase

During the trial, and pursuant to *Jackson v. Denno*, 84 S. Ct. 1774, 1781 (1964), Judge Stovall conducted a two-day hearing out of the jury's presence on the admissibility of Soffar's first three written statements. During the *Jackson v. Denno* hearing, Bruce Clawson testified that Soffar neither asked for an attorney, nor had any questions about his rights. *See* Part I.C.iii. At the conclusion of the admissibility hearing, Judge Stovall entered an

---

[44] We find counsel's defense strategy in this regard to be inexplicable. Given the powerfully exculpatory nature of the inconsistencies between Garner's account of events and Soffar's confession, which inconsistencies would render Soffar's confession implausible, one would have expected defense counsel to do everything in their power to get the substance of Garner's police interviews before the jury either by calling Garner as a witness or by introducing the transcription of these interviews. Defense counsel should have at least interviewed Garner to determine if he could and would testify at Soffar's trial consistent with his (Garner's) prior statements. If Garner was not able or willing to so testify, defense counsel should have offered the prior statements, recorded and transcribed by the police, as record evidence of his testimony. Simply put, we are baffled by defense counsel's strategy, or complete lack thereof, regarding Garner's statements to the investigators.

oral ruling that the three statements were freely and voluntarily made after appropriate *Miranda* warnings. A written order to the same effect was entered on May 22, 1981. In his rulings, Judge Stovall held that each of Soffar's first three written statements was signed after Soffar "knowingly, intelligently and voluntarily waived the Statutory and Constitutional rights."

Clawson and the other witnesses who testified at the *Jackson v. Denno* hearing, also repeated the essence of their testimony before the jury. The State offered the testimony of Lawrence "Pops" Bryant and his girlfriend, Mabel Cass to corroborate Soffar's confession. Bryant ultimately testified that several weeks after the bowling alley robbery-murders, Soffar asked him if he had heard about the bowling alley murders and then stated to him "if I told you who did it you wouldn't believe me." During this conversation, Soffar told Bryant that three people got shot. And Bryant testified that Soffar indicated to him that he and Latt were involved in the bowling alley deal. Mabel Cass did not participate in, but witnessed the conversation between Bryant and Soffar, and confirmed in substance that Soffar talked to Bryant about the bowling alley robbery-murders.

Defense counsel presented its case based on an alibi theory. Soffar's mother, Zelda Soffar and other witnesses confirmed that Soffar spent the entire weekend of July 12-13, 1980 helping a family member move. Martin and Donna Naylor testified that they

59

dropped Soffar off at his mother's house in Friendswood sometime after 7:00 p.m. on the evening of July 13, 1980. According to the Naylor's, all of the men who were moving the family belongings were exhausted from working all day, for two days straight in the summer heat. Mrs. Soffar testified that Max was exhausted when he was dropped off and that he watched a little bit of television and then went straight to bed. She testified that he was in the house when she awoke the next morning, July 14, 1980.[45]

On March 31, 1981, the jury returned a verdict of "guilty of the offense of capital murder."

### ii. Penalty Phase

Beginning on April 1, 1981, Judge Stovall presided over the penalty phase of Soffar's trial, which itself lasted three days. During the penalty phase, and again pursuant to **Jackson v. Denno**, 84 S. Ct. 1774 (1966), the trial court conducted a hearing out of the jury's presence on the admissibility of Soffar's fourth written statement, that is, his confession to the rape of Caroline Knight. At the conclusion of the hearing, the trial court ruled that Soffar's fourth statement was freely and voluntarily made without

---

[45] Mrs. Soffar, who had a substantial hearing problem also testified that, though she did not hear Max or anyone else come or go that evening, and though the family dog never barked as it normally did when people came to the house, Max's bedroom door had its own exterior door. Prosecutor Tobias suggested during her cross-examination that it was possible that Soffar left, committed the bowling alley robbery-murders, and then returned before she awoke.

60

compulsion or persuasion and that the requisite *Miranda* warnings had been given.

The State called numerous witnesses to attest to Soffar's criminal history and reputation for having a violent temper. The State also called Caroline Knight, the rape victim, to identify Soffar as her assailant and to relate to the jury that Soffar had told her during the rape that he had killed three other women and that she was going to be the fourth. Defense counsel did not interview Ms. Knight prior to trial and cross-examined her only with respect to her prior inability to identify Soffar in either a photo spread or line-up. Soffar's defense counsel presented no testimony or evidence of any kind whatsoever during the penalty phase.

The jury was instructed as it began deliberations in the penalty phase that it could "consider the evidence of the extraneous sexual assault of Carolyn [sic] Knight for the limited purpose of aiding the jury in answering any questions that might be presented in the punishment charge . . . ." The three special issues submitted to the jury pursuant to the applicable version of Article 37.071(b) of the Texas Criminal Code were as follows:

A. Do you find from the evidence beyond a reasonable doubt that the conduct of the Defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result?

B. Do you find from the evidence beyond a reasonable doubt that there is a probability the Defendant would commit

criminal acts of violence that would constitute a continuing threat to society?

C. Do you find from the evidence beyond a reasonable doubt whether the conduct of the Defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased?

On April 3, 1981, the jury returned its verdict answering each of the three special issues in the affirmative. Thus, the trial court entered an order sentencing Soffar, in accordance with the jury's verdict and pursuant to Texas Code Criminal Procedure article 37.071(e) (Vernon 1981), to death by lethal injection.

## H. Post-Conviction Proceedings

Soffar's conviction and sentence were automatically appealed to the Texas Court of Criminal Appeals which, on September 23, 1987, affirmed Soffar's conviction and sentence in a written opinion. *See Soffar v. State*, 742 S.W.2d 371 (Tex. Ct. Crim. App. 1987) (en banc). Soffar's conviction became "final" for purposes of this appeal when the United States Supreme Court denied Soffar's petition for writ of certiorari on October 10, 1989. *See Soffar v. State*, 110 S. Ct. 257 (1989).

On December 14, 1992, Soffar filed a state application for writ of habeas corpus in the 232nd District Court of Harris County, Texas, alleging twenty-four grounds for relief. Judge A.D. Azios[46]

---

[46] Judge Azios was not the same judge who tried the case originally. Judge Van Stovall, who was a visiting judge, presided over Soffar's original trial.

62

conducted a thirteen-day evidentiary hearing during the time period between August 16, 1994 and September 8, 1994. On November 10, 1995, Judge Azios entered written findings of fact and conclusions of law recommending denial of Soffar's application. On April 8, 1996, the Texas Court of Criminal Appeals, in a two-paragraph, unpublished per curiam opinion, followed Judge Azios's recommendation and denied Soffar's application for habeas corpus relief.

On April 22, 1996, Soffar filed his first federal petition for writ of habeas corpus in the United States District Court for the Southern District of Texas alleging twenty-four claims for relief. Soffar filed a motion for partial summary judgment in the district court, and the Director filed a motion for summary judgment on all of Soffar's claims. The Director did not contest that Soffar had sufficiently exhausted his available state remedies, except with respect to claim 24, as to which the Director waived exhaustion, and with respect to a portion of Soffar's *Brady*[47] claims, which were premised upon the State's alleged suppression of a ballistics report and the pretrial statements of Greg Garner. The district court assumed that Soffar had properly exhausted his state court remedies with respect to the *Brady* claims, and denied Soffar's *Brady* claims on the merits. The district court refused to grant

---

[47] *Brady v. Maryland*, 83 S. Ct. 1194 (1963).

Soffar's motion for discovery and an evidentiary hearing,[48] and entered a written order granting the Director's motion for summary judgment on all claims. Soffar timely filed his notice of appeal, and his motion for issuance of a certificate of probable cause to appeal was denied by the district court. Soffar has now timely moved this Court for issuance of such a certificate.

## II. DISCUSSION

While in both his state and his federal habeas petitions, Soffar asserted twenty-four claims for relief, in his pending motion for issuance of a certificate of probable cause, Soffar argues only the following five issues:

A. Was the extraneous offense evidence used against Soffar in the penalty phase (i.e., his fourth written statement-the rape confession) tainted by the State's violation of Soffar's Sixth Amendment rights, by its violation of his rights to due process, by suppression of material exculpatory evidence, by the ineffective assistance of his counsel, or by the cumulative effects of the foregoing violations?

B. Were the three written statements used against Soffar in the guilt phase obtained by a violation of Soffar's right to counsel and right to remain silent, and were they, under the totality of the circumstances, not the product of a voluntary waiver of Fifth Amendment rights?

C. Should the guilty verdict be set aside because, contrary to the requirements of due process, the State presented false and misleading evidence at

---

[48] The district court specifically found "that the Record was sufficient for determination of the pending motions," and denied Soffar's motions to augment the record.

64

trial and withheld material exculpatory evidence from Soffar?

D. Should the guilty verdict and death sentence be set aside because Soffar's defense counsel provided ineffective assistance of counsel during both the guilt and penalty phases?

E. Would the execution of a death sentence, after the lengthy period of delay incurred, constitute cruel and unusual punishment, contrary to the Eighth and Fourteenth Amendments?

For the reasons set forth below, we construe Soffar's motion for a certificate of probable cause to be a motion for certificate of appealability and grant the same for limited portions of the first, second, and fourth issues identified above.

## A. Guiding Standards of Review

We begin our discussion of the law in this very troublesome case with a clear statement of certain landmarks which must guide our review and analysis of the record and our decision as to relief in this case. Initially, we note that this is Soffar's first federal habeas corpus petition.[49] As such, Soffar is entitled to a careful and thorough review of all of his claims without concern or limitation that there is any abuse of the writ of habeas corpus under prior law or any concerns as to successive writs under current statutes.

---

[49] We note also that there is nothing in the record before us to indicate that, in the eleven years since Soffar's conviction became final, an execution date has ever been set for Soffar.

### i. Applicability of AEDPA

We also note that this, Soffar's first federal habeas corpus petition, was filed pursuant to 28 U.S.C. § 2254 on April 22, 1996, two days prior to the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-132, 110 Stat. 1269 (1996). AEDPA made significant substantive and procedural changes in the federal statutory framework for evaluating the habeas corpus claims of state prisoners. Given that Soffar's petition was filed before AEDPA's effective date, we are bound by the Supreme Court's decision in *Lindh v. Murphy*, 117 S. Ct. 2059 (1997) to apply the substantive provisions of § 2254 as they existed prior to the changes made by AEDPA.

Additionally, as Soffar's state capital murder conviction became final in October 1989, when the United States Supreme Court denied his petition for writ of certiorari on direct appeal, *see Soffar v. State*, 110 S. Ct. 257 (1989), we will survey and take a snapshot of the landscape of federal constitutional law as it existed in October 1989 to determine which of those constitutional rights claimed by Soffar were available at that time and may be considered in this appeal.

### ii. Certificate of Appealability

Soffar filed his notice of appeal from the decision of the district court in this case on April 24, 1998, and he filed his motion requesting issuance of a certificate of probable cause to

66

appeal with this Court on September 3, 1998.  Unlike the initial filing of his § 2254 habeas petition, both of these events occurred *after* the effective date of AEDPA, April 24, 1996.

During the pendency of this appeal, the United States Supreme Court entered its decision in ***Slack v. McDaniel***, 120 S. Ct. 1595 (2000)**,** which held that the amended procedural provisions of AEDPA dealing with appeals from the federal district court to the federal circuit courts, by individuals in custody pursuant to a state conviction, are applicable to all such appeals which were filed after the effective date of AEDPA.  At the time the final judgment in this case was entered by the federal district court, the parties assumed that the appellate procedural provisions of the pre-AEDPA version of 28 U.S.C. § 2253 were applicable to the present appeal, and accordingly, Soffar moved the district court for issuance of a certificate of probable cause to appeal, which was denied by the district court.  Soffar then petitioned this Court for issuance of such a certificate.

In order to avoid unnecessary remand of this case to the district court on this procedural issue, we construe Soffar's motion for issuance of a certificate of probable cause ("CPC") pursuant to the pre-AEDPA version of § 2253, as a motion for issuance of a certificate of appealability ("COA") pursuant to the new statutory provisions of § 2253, and we treat the district court's denial of a CPC as a denial of any COA.  We note that we

67

have repeatedly held that the same substantive standard which governed issuance of a CPC, apply to the issuance of a COA. *See, e.g.,* **Lucas v. Johnson**, 132 F.3d 1069, 1072 (5th Cir.), *cert. dismissed*, 119 S. Ct. 4 (1998).

### *iii.  Soffar's Entitlement to a COA*

Under the provisions of AEDPA, before an appeal from the dismissal or denial of a § 2254 habeas petition can proceed, the petitioner must first obtain a COA, which will issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  We have held that a petitioner makes a "substantial showing" if he can demonstrate that "'reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.'" **Barrientes v. Johnson**, 221 F.3d. 741, 772 (5th Cir. 2000) (quoting **Slack v. McDaniel**, 120 S. Ct. at 1603-04).  As the Supreme Court recently noted, when the district court has rejected the petitioner's constitutional claims on the merits, the showing required for the issuance of a COA under § 2253(c) is "straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  **Slack**, 120 S. Ct. at 1604.

68

We are mindful that our determination of whether a COA should issue must not ignore the deferential scheme set forth in § 2254(d). *See* **Barrientes**, 221 F.3d at 772 (citing **Hill v. Johnson**, 210 F.3d 481, 484-85 (5th Cir. 2000)). Under the pre-AEDPA provisions of § 2254(d), which govern our substantive review of the merits of Soffar's petition, when considering a petition for writ of habeas corpus, we presume the factual determinations of the state court made after a hearing to be correct unless one or more of the following exceptions to such a presumption of correctness applies:

> **(1)** that the merits of the factual dispute were not resolved in the State court hearing;
>
> **(2)** that the fact finding procedure employed by the State court was not adequate to afford a full and fair hearing;
>
> **(3)** that the material facts were not adequately developed at the State court hearing;
>
> **(4)** that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;
>
> **(5)** that the applicant was an indigent and the State court, in deprivation his constitutional right, failed to appoint counsel to represent him in the State court proceeding;
>
> **(6)** that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding;
>
> **(7)** that the applicant was otherwise denied due process of law in the State court proceeding;
>
> **(8)** or unless that part of the record of the State court proceeding in which the determination of such

69

> factual issue was made, pertinent to a
> determination of the sufficiency of the evidence to
> support such a factual determination, is produced
> as provided for hereinafter, and the Federal court
> on consideration of such part of the record as a
> whole concludes that such factual determination is
> not fairly supported by the record[.]

28 U.S.C. § 2254(d) (1948).

Notwithstanding this deferential scheme for state court factual determinations, we review the federal district court's factual findings for clear error, and we review issues of law de novo. *See* **Crane v. Johnson**, 178 F.3d 309, 312 (5th Cir.), *cert. denied*, 120 S. Ct. 369 (1999). With the foregoing principles in mind, our first task is to determine whether Soffar has made a substantial showing of the denial of a constitutional right with respect to any of his numerous issues.

### a. Fifth Amendment Challenge

Soffar's most compelling issue in this appeal is his second. Soffar claims that the State violated his Fifth Amendment privilege against compelled self-incrimination by interrogating him after he had invoked his right to counsel, and further, that the State obtained an invalid waiver of his rights by virtue of Detective Clawson's untrue and deceptive responses to Soffar's questions about obtaining counsel, which rendered his subsequent custodial statements involuntary.

While the factual findings in both the state and federal district courts are entitled to a presumption of correctness, we

note that the state habeas court purported to make a factual "finding" that "Soffar did not, prior to or contemporaneous with the giving of his statements, invoke his right to counsel." The determination of whether a suspect's statements or questions constitute an "invocation of the right to counsel" is a legal conclusion, *see **United States v. Cruz***, 22 F.3d 96, 98 n.6 (5th Cir. 1994) (citing ***Smith v. Illinois***, 105 S. Ct. 490, 492 (1984)). As such, it is not entitled to the presumption of correctness afforded factual findings under § 2254(d).

The federal district court also noted the state habeas court's factual determination that "Bruce Clawson did not consider the applicant's questions regarding an attorney [to be] an invocation of the applicant's rights." The district court then stated that, based upon the presumption of correctness to which the state court's factual finding was entitled, "Soffar's contention must be rejected as a factual matter." Yet, the district court's conclusion in this regard overlooks the fact that Clawson's testimony as to a legal conclusion (i.e, that Soffar did not "invoke his rights") is merely a factual matter, and the determination of whether Soffar actually did invoke his right to counsel was a legal determination, not a factual one. Thus, the State habeas court's factual determination of what Clawson thought Soffar's questions meant cannot be dispositive of the legal issue

71

of whether Soffar, as a matter of law, invoked his right to counsel.

The only factual finding challenged by Soffar is the state court's failure to reference Clawson's "obvious answer" remark in which Clawson acknowledged that, with respect to Soffar's questions about getting an attorney, "the obvious answer was that he wanted an attorney."  The district court acknowledged this statement in its order, but concluded that Clawson's testimony as a whole supported the state habeas court's finding that Bruce Clawson did not consider Soffar's question to be an invocation of his right to counsel.  We find that jurists of reason could most certainly debate over the legal issue of whether or not, in light of Clawson's "obvious answer" remark, Soffar had made a sufficiently clear invocation of his right to counsel under *Edwards v. Arizona*, 101 S. Ct. 1880 (1981), such that interrogation was required to cease, irrespective of what Clawson "thought."  Furthermore, the district court's conclusion that Clawson's misleading and deceptive responses to Soffar's inquiries about an attorney did not invalidate all of Soffar's subsequent waivers of his right to counsel, is likewise debatable.

Without further elaboration, our review of the entire record in this appeal, taken with due consideration of the deferential scheme set forth in the pre-AEDPA version of § 2254(d), persuades us that Soffar has "made a substantial showing of the denial of a

72

constitutional right" as to his second issue, the Fifth Amendment challenge, and we grant him a COA on that issue, as stated above.

### b.  Remaining Issues

Because, as is discussed *infra*, we determine that Soffar is also entitled to full relief from his conviction and sentence based on his Fifth Amendment challenge, and because Soffar's remaining issues do not seek relief beyond that which will be granted on Fifth Amendment grounds, we need not address Soffar's entitlement to a COA on any other issue.  However, for the purpose of record preservation, we also find that Soffar has made a substantial showing of the denial of a constitutional right with respect to, and we grant a COA on the following additional issues:

> (1) Was the extraneous offense evidence used against Soffar in the penalty phase, that is, Soffar's August 19, 1980 written statement as to the rape of Caroline Knight, tainted by a violation of Soffar's Sixth Amendment rights because the State interrogated Soffar after he had requested and been appointed counsel?

> (2) Was Soffar denied the effective assistance of counsel by virtue of his trial counsel's failure to investigate, develop, and present available evidence during the guilt phase of Soffar's trial; specifically, the failure to retain a ballistics expert or develop ballistics evidence, and the failure to investigate, develop, or present evidence with respect to the surviving witness, Greg Garner's, statements to police?

By virtue of the fact that our grant of relief with respect to Soffar's Fifth Amendment challenge would render discussion of the merits of these additional issues unnecessary, we likewise need not

73

belabor the justifications for granting a COA on those issues. Suffice it to say, our review of the record of this case, and most particularly the undisputed and peculiar facts of this case set forth above, accompanied by our attendant concerns with this most troublesome case, convince us that Soffar has made a substantial showing of the denial of constitutional right for each of these additional issues. These issues could undoubtedly be resolved differently by, and would be debatable among jurists of reason. Furthermore, each deserves encouragement to proceed further. Thus, a COA for each of these two issues is granted. Soffar's request for issuance of a COA with respect to all of his remaining claims is denied.

## B. Fifth Amendment Violation

Soffar's Fifth Amendment challenge was originally briefed in both the state and federal habeas petitions as an ineffective assistance of counsel claim based on trial counsel's alleged failure to investigate, develop, and present the facts requiring suppression of Soffar's statements to the police on August 5-7, 1980. In this appeal, Soffar asserts a substantive Fifth Amendment challenge based upon the State's violation of the privilege against self-incrimination, which is in turn based on the State's violation of the right to counsel. We need not address whether, by virtue of failing to present this Fifth Amendment challenge as a stand alone

74

claim, Soffar has failed to exhaust his state remedies and is thus procedurally barred from presently pursuing this claim, as the State has not seen fit to raise the issue of procedural bar and has in fact, waived any such argument by conceding that Soffar has fully exhausted his available state court remedies.[50] *See* **Goodwin v. Johnson**, 132 F.3d 162, 177 (5th Cir. 1997) ("[g]iven that the state has not seen fit to argue in this court, the district court, or even its own courts that [the petitioner's] Fifth Amendment claim is procedurally defaulted, we would advance no interest in federalism or comity by raising the issue ourselves."). Additionally, though presented as an ineffective assistance claim in the habeas petitions, and not as a stand alone Fifth Amendment challenge, Soffar's Fifth Amendment challenge was fully presented and addressed on the merits by the parties and by both the state and federal habeas courts, and is thus, properly before us. *See* **Nobles v. Johnson**, 127 F.3d 409, 420 (5th Cir. 1997) ("a habeas petitioner must have fairly presented the substance of his claim to the state courts" in order to have exhausted state remedies).

### i. Fifth Amendment Rights Defined

The Fifth Amendment to the Constitution guarantees that no person "shall be compelled in any criminal case to be a witness

---

[50] In its briefing to this Court, the State does not contest that Soffar has sufficiently exhausted his available state remedies except with respect to claim 24, for which the Respondent waived exhaustion, and with respect to a portion of Soffar's **Brady** claims.

against himself." U.S. C_{ONST}. amend. V.  This guarantee is generally known as the Fifth Amendment privilege against compelled self-incrimination.  This privilege is protected against abrogation by the States through the Fourteenth Amendment.  *See Goodwin*, 132 F.3d at 178 (citing *Malloy v. Hogan*, 84 S. Ct. 1489, 1492 (1964)).

As a necessary and integral component of the privilege against self-incrimination, the Supreme Court recognized in *Miranda v. Arizona*, 86 S. Ct. 1602 (1966), that during custodial interrogation, "the right to have counsel present . . . is indispensable to the protection of the Fifth Amendment privilege." *Id.* at 1625.[51]  Thus, the Court announced that when a suspect declares that he wants an attorney, "the interrogation must cease until an attorney is present." *Id.* at 1628; *see also Edwards v. Arizona*, 101 S. Ct. 1880, 1884-85 (1981) (once the accused "expresse[s] his desire to deal with police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available").  In this appeal, Soffar contends that he invoked his right to counsel when he asked Bruce

---

[51] We note the recent decision of the United States Supreme Court in *Dickerson v. United States*, 120 S. Ct. 2326 (2000), which clearly reaffirms the constitutional basis underlying the *Miranda* decision.

Clawson about getting a lawyer, and that once he invoked his right to counsel,[52] the police were required to cease interrogating him until counsel was present.

A suspect may, of course, waive his right to have counsel present during custodial interrogation, and once a valid waiver of that right is given, the police are free to interrogate the suspect until such time as he may subsequently assert his right to counsel. *See* **Edwards**, 101 S. Ct. at 1884 (citing **North Carolina v. Butler**, 99 S. Ct. 1755, 1757-59 (1979)). With respect to a waiver of the right to have counsel present, the Supreme Court in **Miranda** made it clear that any such waiver must be made knowingly and voluntarily, i.e., after a suspect is given proper notification of the specific rights enumerated in **Miranda** and the suspect acknowledges understanding such rights. To the end of ensuring that waivers are fully voluntary and not compelled by the exertion of force, pressure, or intimidation by custodial authorities, the Court stated, "any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did

---

[52] The right to counsel is often referred to as the Fifth Amendment right to counsel, though technically, such reference is a misnomer by virtue of the fact that the right to counsel is simply a judicially created rule established to safeguard the Fifth Amendment privilege against compelled self incrimination. *See* **Goodwin**, 132 F.3d at 178 n.12. For purposes of our discussion, we will refer to Soffar's challenge to the State's alleged violation of his right to counsel, i.e., the judicially created rules which safeguard his Fifth Amendment right against self-incrimination, as simply his Fifth Amendment challenge.

not voluntarily waive his privilege [against self-incrimination]." *Miranda*, 86 S. Ct. at 1629. Soffar contends that any waiver which he may have given to Clawson by agreeing to speak with detectives after Clawson gave misleading and deceptive responses to Soffar's inquires about a lawyer, was invalidated under *Miranda* because such waiver was obtained by trickery, and thus, all subsequent waivers which he gave based on the erroneous information regarding his rights, were also invalid.

Notwithstanding the foregoing waiver principles, once a suspect does invoke his right to counsel, and the police do initiate further custodial interrogation without counsel present, the suspect's subsequent statements, "made without having had access to counsel, [do] not amount to a valid waiver and hence [are] inadmissible." *Edwards*, 101 S. Ct. at 1886. The *Edwards* Court concluded that a valid waiver of the right to have counsel present is not established simply by showing that the suspect responded to further custodial interrogation, even if he had been advised of his rights in so doing. *See Edwards*, 101 S. Ct. at 1884-85; *see also McNeil v. Wisconsin*, 111 S. Ct. 2204, 2208 (1991) ("the suspect's [post-invocation] statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes [or gives] a waiver and his statements would be considered voluntary under traditional standards."). Thus, irrespective of whether a subsequent waiver is

78

knowing and voluntary, once a suspect invokes his right to have counsel present, no valid waiver of that right can be obtained until such time as counsel is present. This principle extends for as long as the suspect remains in custody without receiving counsel and irrespective of whether the interrogating officer was aware of the initial invocation of the right to counsel or whether the subject of subsequent interrogation pertains to a different offense than that for which the suspect was originally questioned. *See Arizona v. Roberson*, 108 S. Ct. 2093, 2098-2100 (1988) (once the right to counsel is invoked, police officers may not reapproach him regarding *any* offense unless counsel is present-"we attach no significance to the fact that the officer who conducted the second interrogation did not know that the [suspect] had made a request for counsel." *Id.* at 2101.).[53]

Soffar also contends that once Clawson violated his right to have counsel present, his subsequent custodial interrogation by police could not constitute a valid waiver of his right to counsel. Thus, Soffar contends that his three written statements of August 5-7 1980, must be "presumed involuntary" and as such, they were

---

[53] We note that *Roberson* announced a new rule of constitutional law when it was decided. Under *Teague v. Lane*, 109 S. Ct. 1061 (1989), the new rule announced in *Roberson* cannot be asserted by a habeas petitioner whose conviction became final before 1988. *See Goodwin*, 132 F.3d at 179 n.13. As Soffar's conviction became final in October 1989, when the Supreme Court denied certiorari from the Texas Court of Criminal Appeals' affirmance of his conviction and sentence on direct appeal, *see Casapri v. Bohlen* 114 S. Ct. 948, 953 (1994), *Roberson* is applicable to Soffar's habeas claims.

inadmissible as substantive evidence at his trial.

### ii. Disposition Below

As a necessary component of the ineffective assistance of counsel claim asserted by Soffar for his trial counsel's alleged failure to investigate, develop, and present the facts which would have resulted in suppression of Soffar's August 5-7 written statements, the district court considered and decided whether Soffar had invoked his right to counsel and whether Soffar effectively waived his *Miranda* rights.

The district court acknowledged and relied upon the state habeas court's unchallenged factual findings regarding Bruce Clawson's affidavit and evidentiary hearing testimony. Specifically, the district court recounted Bruce Clawson's affidavit testimony, extracted *supra*, regarding Soffar's first mention of the need for an attorney. The district court also considered as fact, though the state habeas court made no reference to it, Clawson's state habeas evidentiary hearing testimony that, with respect to Soffar's various questions about a lawyer, Clawson acknowledged that "the obvious answer" was that Soffar "wanted an attorney."

After reciting the general principles of the right to counsel, the district court concluded that, irrespective of the foregoing testimony from Clawson, in his prior habeas testimony, Clawson had testified that he did not himself consider Soffar's questions to be

80

an invocation of his right to counsel.  The district court avoided Clawson's "obvious answer" remark by relying on the fact that in his state habeas hearing testimony, Clawson ultimately responded negatively to the question, "[a]t the time he made those questions or asked you those questions did you consider them an invocation of rights to an attorney?"  The district court concluded that Soffar's contention must "be rejected as a factual matter," based on the state habeas court's factual finding that Clawson did not *himself* consider Soffar's questions to be an invocation.[54]

In making its decision, the district court relied primarily on the rule announced by the Supreme Court in ***Davis v. United States***, 114 S. Ct. 2350 (1994), that police need not stop custodial interrogation if a suspect makes an ambiguous request for counsel, and need do so only when a "clear" request for counsel is received.  Applying ***Davis***, the district court concluded that Soffar had not sufficiently clearly invoked his right to counsel, and thus, law enforcement investigators were free to continue interrogation without counsel present.

---

[54]  Both the state and federal habeas courts also relied upon Clawson's technical responses to the question did Soffar "ask" for an attorney, and upon Clawson's testimony that Soffar did not have any questions about his rights.  The courts did note, but paid little regard to the fact that Clawson stated that he had a mutual pre-trial understanding with the prosecutor that, at trial, he would narrowly interpret the question regarding whether Soffar had any questions about his rights to be in relation to the time period immediately following the reading of the ***Miranda*** warnings and not in relation to Soffar's subsequent questions about getting an attorney.

Finally, the district court concluded that despite Soffar's claim that his waiver of rights was invalidated by police misconduct, i.e., Clawson's false and misleading responses to his questions about a lawyer, Soffar's waiver was knowing and voluntary. The district court concluded that Clawson "did not contradict" the *Miranda* warnings by providing inaccurate information regarding Soffar's rights, and that the record did not support a finding that Soffar did not understand his rights.

### *iii. Standard of Review*

We review the district court's grant of summary judgment de novo. *See **Williams v. Scott***, 35 F.3d 159, 161 (5th Cir. 1994). When reviewing summary judgment on a petition for habeas corpus, consistent with the provisions of 28 U.S.C. § 2254(d), we "presume all state court findings of fact to be correct in the absence of clear and convincing evidence." ***Id.***

The facts related to Soffar's Fifth Amendment challenge are undisputed and the state habeas court's factual findings are unchallenged in this appeal. Though Soffar does challenge the state habeas court's failure to address Clawson's "obvious answer" remark, we note that the district court credited this testimony in its order, and thus it was properly made part of the factual findings which govern resolution of this issue. We will accept and

82

apply the undisputed facts of this case as found by the state and federal habeas courts and as outlined, *supra*.[55]

With respect to a suspect's alleged invocation of constitutional rights, what the suspect actually said or asked is a question of fact, to which the § 2254 presumption of correctness applies. *See **United States v. De La Jara***, 973 F.2d 746, 750 (9th Cir. 1992). However, the ultimate determination of whether the suspect's statements were sufficient to invoke such constitutional rights is a legal determination, which we review de novo. *See **id.*** Thus, whether Soffar's questions regarding counsel were sufficient to invoke his right to counsel, is a legal determination for which we apply de novo review.

### *iv. Legal Landscape Governing Review*

In considering Soffar's Fifth Amendment challenge on de novo review we must first identify the legal principles which govern disposition of his claims. Soffar's conviction became final in October 1989. Under ***Teague v. Lane***, 109 S. Ct. 1060 (1989), we may not apply new rules of constitutional law relating to the merits of Soffar's claims that were announced after October 1989. Thus, we must survey the legal landscape as it existed in October 1989 to determine those constitutional rules which govern our disposition. *See **Jackson v. Johnson***, 217 F.3d 360, 363 (5th Cir. 2000)

---

[55]  We note, however, that those "findings" of the state habeas court which are in truth legal conclusions, will not be afforded deference under §2254(d).

(citations omitted).  Our survey of the legal landscape as it existed in October 1989 reveals the following principles of law with respect to the Fifth Amendment challenge raised by Soffar.

### a. Clear Invocations of the Right to Counsel

At the time Soffar's conviction became final, it was well settled in the law that if a suspect makes a clear and unambiguous statement invoking his right to have counsel present, all police custodial interrogation must cease until counsel is made available, and any subsequent statements taken without the benefit of counsel present are inadmissible.  See *Miranda*, 86 S. Ct. at 1628; *see also* *Edwards*, 101 S. Ct. at 1885; *United States v. Cherry*, 733 F.2d 1124, 1130 (5th Cir. 1984).

### b.  Ambiguous Requests for Counsel

Surveying the legal landscape as it existed in October 1989, we find that the Supreme Court had not spoken as to the constitutional rule which would be required with respect to equivocal or ambiguous requests for counsel that a suspect makes during custodial interrogation.  In two cases, *Connecticut v. Barrett*, 107 S. Ct. 828 (1987), and *Smith v. Illinois*, 105 S. Ct. 490 (1984), the Supreme Court recognized that an accused's asserted request for counsel may occasionally be ambiguous or equivocal and noted that the Circuit Courts of Appeal were in conflict about how to handle such a request, but the Court declined to resolve the conflict in each of the cases before it.  See *Smith*, 105 S. Ct. at

84

493 n.3; **Barrett**, 107 S. Ct. 832 n.3. Accordingly, this Circuit's decisions in **United States v. Cherry**, 733 F.2d 1124 (5th Cir. 1984), **Thompson v. Wainwright**, 601 F.2d 768 (5th Cir. 1979), and **Nash v. Estelle**, 597 F.2d 513 (5th Cir. 1979) (en banc), were controlling and established the law of this Circuit with respect to what procedures must be followed if a suspect makes an ambiguous or equivocal request for counsel. In **Nash** we held that pursuant to the principles of **Miranda** and the Fifth Amendment, the only permissible questions once an equivocal request for counsel is asserted, are clarifying questions to determine whether the suspect is indeed invoking his right to counsel. *See* **Nash**, 597 F.2d at 517. In **Thompson v. Wainwright**, we further affirmed our rule and summarized the law of this Circuit as follows:

> Whenever even an equivocal request for an attorney is made by a suspect during custodial interrogation, the scope of that interrogation is immediately narrowed to one subject and one only. Further questioning thereafter must be limited to clarifying that request until it is clarified. When and if it is clarified as a present desire for the assistance of legal counsel, all interrogation must cease until that is provided just as in the case of the initial unambiguous request for an attorney. And no statement taken after that request is made and before it is clarified as an effective waiver of the present assistance of counsel can clear the **Miranda** bar.

**Thompson**, 601 F.2d at 771-72. Similarly, in the factually similar case of **Cherry,** in which we grappled with many of the same concerns we are faced with in this case, we recognized that **Nash** and

85

***Thompson*** established the procedure to be followed when a suspect expresses an equivocal request for counsel, and that our decisions in ***Nash*** and ***Thompson*** were not altered in any way by the decision of the Supreme Court in ***Edwards*** because ***Edwards*** did not address what would be required of interrogating officers faced with an "ambiguous" request for counsel. Thus, under our Circuit's precedent as it existed in October 1989, when a suspect uttered an ambiguous or equivocal request for an attorney, all interrogation was to be narrowed to the single issue of clarification until the suspect gave either an unambiguous request for counsel, at which time all questions must have stopped or until the suspect gave an unambiguous, knowing, and voluntary waiver of his right to have counsel present, at which point questioning could resume.

In this appeal, the State contends that Soffar's questioning about getting an attorney was an ambiguous and equivocal request, but under the later decision of the Supreme Court in ***Davis v. United States***, 114 S. Ct. 2350 (1994), which was relied upon by the district court, the interrogating officers were *not* required to cease questioning. ***Davis*** was decided after Soffar's conviction became final and by the Supreme Court's own account it fixed a new rule when decided.[56] We note that there is nothing in the Supreme

---

[56] In ***Davis***, the Supreme Court acknowledged that the rule it was creating with respect to ambiguous and equivocal requests for counsel was its first. Specifically, the Court stated:

Although we have twice previously noted the varying

86

Court's decision in *Davis* which explicitly indicates that the Court intended for the new rule stated therein to be made retroactively applicable to habeas corpus proceedings involving cases in which the conviction became final prior to the announcement of the rule in *Davis*. Yet by implication, the State argues that we are permitted (and required) to "deny" habeas relief by retroactively applying a new rule announced by the Supreme Court.

The Third Circuit echoed the State's position with respect to the retroactive applicability of *Davis* in *Flamer v. Delaware*, 68 F.3d 710, 725 n.14 (3d Cir. 1995), in which the court held that *Davis* may be applied retroactively despite *Teague* because *Teague* only applies to new rules favoring petitioners. *See id.* The Third Circuit's decision was based on the reasoning set forth by the Supreme Court in *Lockhart v. Fretwell*, 113 S. Ct. 838, 844 (1993), in which the Supreme Court explained that federal habeas

---

approaches the lower courts have adopted with respect to ambiguous or equivocal references to counsel during custodial interrogation, *see Connecticut v. Barrett*, 479 U.S. 523, 529-530, n.3, 107 S. Ct. 828, 832, n.3, 93 L.Ed.2d 920 (1987); *Smith v. Illinois*, 469 U.S. 91, 96, n.3, 105 S. Ct. 490, 493, n.3, 83 L.Ed.2d 488 (1984) (per curiam ), we have not addressed the issue on the merits. We granted certiorari, 510 U.S. 942, 114 S. Ct. 379, 126 L.Ed.2d 329 (1993), to do so.

*Davis*, 114 S. Ct. at 2354; *see also Smith*, 105 S. Ct. at 493 n.3 (recognizing Fifth Circuit decision in *Thompson v. Wainwright*, 601 F.2d 768, 771-772 (5th Cir. 1979) as requiring narrowing of continued questioning to the sole issue of clarifying whether suspect is making an invocation of the right to counsel after an ambiguous or equivocal request for counsel is made).

petitioners do not have the "interest in the finality of the state court judgment under which [they are] incarcerated" which the State does. *Id.* The State's unshared interest justifies the **Teague** rule, which was established to avoid penalizing the State for relying on the constitutional standards which were prevailing when the original proceedings occurred but which were altered by subsequent Supreme Court precedent. *See **id.*** The Court went on to note that a petitioner does not ordinarily have any "claim of reliance on past judicial precedent as a basis for his actions that corresponds to the State's interest." *Id.* The Court described the fact that, as a result of this analysis, the State will benefit from a **Teague** decision while the petitioner will not, as a "perfectly logical limitation of **Teague** to the circumstances which give rise to it." *Id.* Like the Third Circuit, we recognize that we cannot avoid the Supreme Court precedent dictating that **Davis** may be made applicable to Soffar's conviction, despite the otherwise prohibitive features of **Teague**.

The State argues that it is the application of the rule Soffar seeks regarding ambiguous requests for counsel, i.e., the rule of **Cherry**, **Thompson**, and **Nash**, which is barred by the non-retroactivity principles of **Teague**. We apply **Teague** in three steps: first, we determine when the petitioner's conviction and sentence became final; second, we then survey the legal landscape as it then existed to determine whether a state court considering

88

the petitioner's claim would have felt compelled by existing precedent to conclude that the rule he seeks was required by the Constitution; and third, if the rule he seeks is a new one, not dictated by then-existing precedent, we look to see if either of the two exceptions to non-retroactive applicability fit the case at hand. *See* **Jackson v. Johnson**, 217 F.3d 360, 363 (5th Cir. 2000). Here, we know that Soffar's conviction became final for purposes of **Teague** on October 10, 1989, and our survey of the legal landscape as of that time persuades us that the settled law in this Circuit was that an ambiguous or equivocal request for counsel during custodial interrogation required cessation of interrogation until clarification of that request was achieved and a knowing and voluntary waiver was given and that interrogating officers could not use the opportunity to respond to ambiguous or equivocal requests as a subterfuge for coercion, intimidation, or trickery. And while we recognize that a Texas state court would not have been legally *bound* to apply our Circuit precedent on this constitutional issue, in the absence of Supreme Court or binding state court authority to the contrary, and with the Supreme Court's explicit recognition of the rule of **Thompson** in **Smith v. Illinois**, 105 S. Ct. 490, 493 n.3 (1984), we conclude that a Texas state court would have *felt compelled* to apply the rule identified in **Cherry**, **Thompson**, and **Nash** with respect to ambiguous requests for counsel. Consequently, Soffar is not asserting a "new rule" and we need not

89

assess the applicability of the exceptions to *Teague* in the third step.

But all of that having been said, while *Teague* does not bar the application of the rule announced in *Cherry*, *Thompson*, and *Nash* to Soffar's benefit, as noted above, it likewise does not prevent the applicability, to Soffar's detriment, of the rule announced in *Davis*, which abrogated the portions of *Cherry, Thompson*, and *Nash* explicitly requiring all questioning to be narrowed to the sole issue of clarification of an ambiguous request, and which authorized continued questioning without a clarification requirement. Notwithstanding the applicability of *Davis*, however, we note that *Davis* specifically recognized that, while officers are not *required* to ask clarifying questions when they are faced with an ambiguous request for counsel, "it will often be good police practice for the interviewing officers to clarify whether or not [the suspect] actually wants an attorney." *Davis*, 114 S. Ct. at 2356. Nothing in *Davis* altered our holding in *Nash* that interrogating officers who do seek clarification of an ambiguous or equivocal request for counsel are not permitted "to utilize the guise of clarification as a subterfuge for coercion or intimidation." *Nash*, 597 F.2d at 517. Nor did *Davis* alter our holding in *Thompson* that, when clarifying an ambiguous or equivocal request for counsel, under no circumstances may an officer "mislead [a suspect] into abandoning his equivocal request for counsel."

90

*Thompson*, 601 F.2d at 772. Indeed, the interpretations of *Miranda* and *Edwards* set forth in our decisions in *Cherry*, *Thompson*, and *Nash*, insofar as they are consistent with *Davis*, *Dickerson*, and other relevant Supreme Court cases, remain untouched and reaffirmed as circuit precedents.

Thus, the law applicable to Soffar's conviction dictates that, if interrogating officers are confronted with an ambiguous or equivocal request for counsel, under *Davis*, they are not *required* to cease interrogation. However, if under *Davis*, the officers exercise good police practice and seek clarification, under this Circuit's holdings in *Nash* and *Thompson*, the officers may not use the clarifying inquiry or their responses to an ambiguous or equivocal request for counsel to coerce, intimidate, or trick the suspect into abandoning his ambiguous or equivocal request for counsel. Such coercion, intimidation, or trickery in order to get a suspect to abandon an unclear request for counsel is not permitted under *Miranda* or *Davis*, and is explicitly prohibited by *Nash* and *Thompson*.

### c. Waivers of Right to Counsel

At the time Soffar's conviction became final, the law with respect to waivers of the right to counsel was well settled. As noted above, once a valid waiver of the right to counsel is given, the police are free to interrogate the suspect until such time as

a suspect may subsequently assert his right to counsel. *See Edwards*, 101 S. Ct. at 1884 (citing *North Carolina v. Butler*, 99 S. Ct. 1755, 1757-59 (1979)). There is a strong presumption against waiver, and in order to establish that statements taken by police during uncounseled custodial interrogation are admissible, the burden rests with the State to establish "that the [suspect] knowingly and intelligently waived his privileges against self-incrimination and his right to retained or appointed counsel." *Miranda*, 86 S. Ct. at 1628. Indeed, courts must "' indulge every reasonable presumption against waiver of fundamental constitutional rights.'" *Michigan v. Jackson*, 106 S. Ct. 1404, 1409 (1986)(quoting *Johnson v. Zerbst*, 58 S. Ct. 1019, 1023 (1938)).

As the district court noted, the Supreme Court has explained the procedure for evaluating the validity of waivers as follows:

> The inquiry has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than, intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 106 S. Ct. 1135, 1141 (1985). As part of this inquiry, courts must consider the unique facts of a particular case, "including the background, experience, and conduct of the

92

accused." ***Oregon v. Bradshaw***, 103 S. Ct. 2830, 2835 (1983) (internal citations omitted). Furthermore, the Supreme Court has made it clear that "any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege [against self-incrimination]." ***Miranda***, 86 S. Ct. at 1629. And finally, under this Circuit's precedent at the time Soffar's conviction became final, a statement "taken . . . after [a suspect] was misled into abandoning his equivocal request for counsel," is violative of ***Miranda. Thompson***, 601 F.2d at 772.

To recap, our survey of the legal landscape as it existed in October 1989 and as applicable to Soffar's petition reveals the following basic principles which guide our review of Soffar's Fifth Amendment challenge: 1) if Soffar made a sufficiently clear invocation of his right to counsel through his questions about getting an attorney, the State's continued interrogation of him violated his right to counsel and all statements derived from his continuous custodial interrogation were inadmissible; 2) if Soffar's questions were but an ambiguous request for counsel, then, while Clawson was not *required* to narrow the scope of questioning to the sole issue of clarifying Soffar's request, if he did, he was obligated not to use the opportunity to clarify to coerce, intimidate, or trick Soffar into abandoning his ambiguous request and if Clawson utilized such deceit and trickery to obtain a waiver

93

of the right to counsel from Soffar and contradicted or undermined *Miranda* in doing so, then Soffar's subsequent waivers of the right to have counsel present during custodial interrogation were invalidated by such actions.

### *v.  Fifth Amendment Challenge-the Merits*

Guided by the foregoing legal principles, we now turn to our analysis of the merits of Soffar's claim that the State violated his Fifth Amendment rights by continuing to interrogate him in custody and without counsel present after he invoked his right to counsel.  We consider first whether Soffar's invocation of his right to counsel was sufficiently clear under the totality of the circumstances, and second, whether Clawson's responses to Soffar's inquiries about a lawyer invalidated his subsequent waivers of the right to have counsel present during his custodial interrogation.

### *a.  Clear Invocation?*

The first question we must answer is whether Soffar's questions to Clawson constituted a clear invocation of his right to counsel.  As the Supreme Court put it in *Edwards* and later in *Davis*, a suspect must "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in

the circumstances would understand the statement to be a request for an attorney." *Davis*, 114 S. Ct. at 2364 (Souter, J., concurring). Although, in *Davis*, the Supreme Court held that police have no duty to stop an interrogation if the suspect makes an ambiguous request for counsel, *Davis* requires the police to stop an interrogation if a reasonable officer, under the totality of circumstances, would understand that the suspect desires to confer with counsel before answering further substantive questions. The *Davis* Court supplied the following test for determining whether a suspect has invoked his right to counsel:

> Although a suspect need not 'speak with the discrimination of an Oxford don,' he must articulate his desire to have counsel present sufficiently clear that a *reasonable officer in the circumstances* would understand the statement to be a request for an attorney.

*Davis*, 114 S. Ct. at 2355 (citations omitted, emphasis supplied).

In deciding whether a request for counsel is sufficiently clear to constitute an invocation of the right to counsel, we must consider "the totality of the circumstances," and we must also remain mindful of the teachings of *Michigan v. Jackson*, 106 S. Ct. 1404, 1409 (1986), wherein the Supreme Court, cognizant of the settled principles of indulging every presumption against waiver and resolving all doubts in favor of protecting constitutional

claims, stated that the courts must "give a broad, rather than a narrow, interpretation to a [suspect's] request for counsel."

The district court relied heavily on the state habeas court's factual finding that Bruce Clawson did not consider Soffar's questions about a lawyer to be an invocation of his right to counsel, and that based thereupon, Soffar's claim that he had sufficiently articulated a request for counsel "must fail as a factual matter." This factual finding, however, is not entitled to the heightened level of deference afforded it by the district court, and as discussed below, taken in the context of Clawson's full testimony, it is most certainly not dispositive of the ultimate legal issue of whether Soffar's statements did constitute an effective invocation, which legal issue is to be decided by the court and not Clawson. Clawson's testimony as to his belief that Soffar's questions were not an invocation, while probative of whether a reasonable officer would understand Soffar's questions to be a request for an attorney, is simply not dispositive, and the district court erred in so stating.

As discussed above, our analysis of the entirety of Clawson's testimony reveals the following. Soffar asked Clawson first whether he should talk to a lawyer. Clawson said "if you're guilty talk to the police, if you're innocent you should talk to a lawyer." Based on this, Soffar then asked "how do I get a lawyer?" Clawson deflected this question by asking, "can you afford" an attorney, implying that if Soffar couldn't afford a lawyer he

96

wouldn't be able to get one. Undeterred, Soffar thirdly asked "then how do I get a court-appointed lawyer, and how long will it take?" Clawson once again deflected this question by giving knowingly false information, i.e., that it could take up to a month to get a lawyer. Finally, based on Clawson's misleading responses, Soffar said "well, then I guess I'm on my own?" We conclude that either Clawson's failure to respond to that question as he stated he did in his state habeas affidavit, or his affirmative response of "yes, you are" as he stated in his state habeas evidentiary hearing testimony (*see supra* note 22), together with Clawson's follow-up question "now will you talk to the detectives again?," constituted an implicit affirmative response to Soffar's last question which was the equivalent of saying "you can't get a lawyer, Max, and yes, you're on your own now." Additionally, we are persuaded by Clawson's state habeas evidentiary hearing testimony, in which Clawson responded to habeas counsel's question, "based on everything you heard and observed . . . what did you conclude [Soffar] wanted?," by stating, "well, the obvious answer is he wanted an attorney."

Clawson also stated in his state habeas testimony that his "duty" as a police officer that day was to keep Soffar talking. Under **Miranda**, Clawson's duty was to respond honestly and completely to Soffar's questions, and not to mislead him into believing that he could not get a lawyer if he wanted one. The

97

fact that Soffar asked how he could get a lawyer immediately in response to Clawson's statement that if he was innocent he should talk to a lawyer, is particularly evident of an invocation of the right to counsel. The essence of Soffar's question was as if Soffar responded, "well, I'm innocent, so how do I get my lawyer?" Unfortunately, Clawson's very next statement was a calculated move to imply that Soffar could only get a lawyer if he could afford one himself, a condition which Clawson knew did not exist. Indeed, it was Soffar who had to interject the idea of getting a court-appointed lawyer. And Clawson's response to that request was equally deceitful. Clawson admitted to knowing about Houston's 72-hour rule, and he further testified that Max was incapable of thinking much farther into the future than the present day, but he responded to Soffar's inquiry by stating that it could take up to a month. Also, Clawson's response when Soffar stated "I guess I'm on my own," which he testified at one point was silence, but which he testified at another point was an affirmative "yes, you are," coupled with Clawson's next question, "so will you talk the cops?," is further evidence that Clawson directly violated the tenets of *Miranda* by pressuring Soffar not to invoke his right to counsel.

Clawson admitted as much in his habeas testimony. According to his testimony, Clawson deliberately "derailed [Soffar's] inquiries about the subject of obtaining a lawyer," because of the pressure he was under from the Houston detectives not to "derail

98

their investigation" by letting their only lead consult a lawyer. Clawson knew that Soffar, seeking Clawson's advice as a friend, would "follow his lead," and he purposefully sought to manipulate Soffar's trust to ensure that Soffar did not ask for a lawyer then, or at any time during the later interrogation, by convincing Soffar that he was going to have to deal with the detectives "on his own." In our view, Soffar tried his best to invoke his rights and get counsel, but Clawson deliberately distorted the reality of Soffar's rights, relying upon his personal relationship with Soffar to convince Soffar that he had none. Our conclusion in this regard is only further supported by Soffar's lament, "I guess I'm on my own then."

We pause here to note that in *Miranda*, the Supreme Court stated that:

> [i]n order fully to apprise a person interrogated of the extent of his rights under this system then, it is necessary to warn him not only that he has the right to consult with an attorney, but also that if he is indigent a lawyer will be appointed to represent him. Without this additional warning, the admonition of the right to consult with counsel would often be understood as meaning only that he can consult with a lawyer if he has one or has the funds to obtain one. The warning of a right to counsel would be hollow if not couched in terms that would convey to the indigent--the person most often subjected to interrogation--the knowledge that he too has a right to have counsel present. As with the warnings of the right to remain silent and of the general right to counsel, only by effective and express explanation to the indigent of this right can there be assurance

99

that he was truly in a position to exercise
it.

*Miranda*, 86 S. Ct. at 1627.  Clawson's responses when Soffar broached the subject of legal assistance were not the answers required by *Miranda* – that he had the right to have an attorney present to advise him without regard to his guilt or innocence and even though he could not afford to pay for one; that the State would pay for a lawyer to assist him in deciding whether to continue talking to the police; and that he could demand that the questioning stop until his attorney was present.  Instead, Clawson's remarks can only be read to mean that Soffar could not have an attorney within a reasonable time unless he could pay for one; that it might take a month for him to obtain the services of a court-appointed lawyer; and in the meantime, he was on his own in dealing with the other police interrogators.

In light of the foregoing, we conclude that Clawson's "belief" that Soffar's inquiries were not a request for an attorney, was simply willful ignorance designed to further his stated goal of ensuring that Soffar did not ask for an attorney.  That Clawson would not allow himself to perceive Soffar's inquiries as an "invocation of the right to counsel" is wholly consistent with Clawson's admitted role as the facilitator of uncounseled custodial interrogation.  Based on these conclusions, we cannot rely on Clawson's testimony that he did not consider Soffar's inquiries to

100

be a request for an attorney as dispositive with respect to the legal issue of whether Soffar invoked his right to counsel.

In our view, and considering the totality of the circumstances, including Clawson's historical association with and understanding of Soffar's thinking, we find that a reasonable officer in Clawson's position, knowing everything about Soffar that Clawson did, but without the stated mission of preventing Soffar from invoking his right to counsel, would have viewed Soffar's series of question to be an invocation of his right to counsel, especially in light of Soffar's follow-up questions to each of Clawson's intentionally deflective responses. Indeed, when referring to the totality of the circumstances surrounding the Clawson-Soffar colloquy, even Clawson stated that it was "obvious" that Soffar "wanted an attorney." Not that he "might" want or "possibly" wanted an attorney, or that he was considering asking for an attorney, but that he indeed "did" want an attorney. In such circumstances as these, where the interrogating officer had personal knowledge of Soffar's background (his inability to afford private counsel) and his distinguishing, relevant character traits (his trust in the officer resulting from a relationship built over time; his modes of communication, including his argot mannerisms, and gestures; and his incapacity to "think much farther into the future than the present day"), a reasonable officer would have understood Soffar's questions and responses to express a clear "desire to have counsel," as in fact Clawson ultimately testified

101

he did understand.

As a result, we conclude that under the totality of the circumstances, Soffar's collective inquiries about getting a lawyer constituted a sufficiently clear invocation, under both *Davis* and *Edwards*, of his right to counsel -- an invocation which Clawson fully appreciated but intentionally ignored. Thus, irrespective of the fact that Soffar gave subsequent, otherwise valid waivers of his rights, all subsequent custodial interrogation was taken in violation of Soffar's Fifth Amendment rights, and the written statements derived from such interrogations were inadmissible in his trial.

### b. *Validity of Waiver*

Even if we assume arguendo that Soffar's request for counsel was merely "ambiguous," our precedent applicable at the time Soffar's conviction became final, including *Cherry*, *Thompson*, and *Nash*, though altered by *Davis* to the extent that questioning is not required to be stopped upon the making of such an ambiguous request, prohibits officers engaged in allegedly clarifying responses to such a request to use the opportunity to respond in order to coerce, intimidate, or trick the suspect into abandoning the equivocal assertion of the right to have counsel present and waiving such right. We note that *Davis* permits, and in fact encourages, officers to seek clarification of the request before any continued substantive questioning. But, more importantly, if

102

an officer like Clawson does undertake to clarify the suspect's request, he may not "utilize the guise of clarification as a subterfuge for coercion or intimidation." **Nash**, 597 F.2d at 517. Clawson was therefore not at liberty to "mislead [Soffar] into abandoning his equivocal request for counsel," and any incriminating statement taken under such circumstances must be deemed to have been obtained "in violation of **Miranda**." **Thompson**, 601 F.2d at 772. The purpose of the clarification inquiry is "not to persuade but to discern," see **id.**, and in this case, Clawson undisputedly asked his deflective questions, not to discern Soffar's true intent, but to persuade him not to invoke his right to counsel and indirectly, to have Soffar re-waive his right to have counsel present. The undisputed facts establish that Clawson deliberately set about to avoid and deflect Soffar's attempts to invoke his right to counsel, to confuse the issue, and to muddy Soffar's perception of the availability of his rights.

Thus, irrespective of **Davis**, Clawson's use of clarifying questions as a "subterfuge for coercion and intimidation" designed specifically to mislead Soffar into abandoning his ambiguous request for counsel and essentially re-waiving his right to counsel, rendered his written statements, taken during subsequent,

103

uncounseled interrogation, violative of *Miranda*.

Additionally, Soffar contends that, in violation of *Miranda* itself, Clawson's misleading responses to his questions directly invalidated his waivers of the right to counsel. As noted above, courts must "`indulge every reasonable presumption  against waiver of fundamental constitutional rights.'" *Michigan v. Jackson*, 106 S. Ct. 1404, 1409 (1986) (quoting *Johnson v. Zerbst*, 58 S. Ct. 1019, 1023 (1938)). The burden of establishing waiver rests with the State, and in order to satisfy its burden, the State must establish that the suspect's waiver was voluntary in the sense that it was not the product of "intimidation, coercion, or deception," and that the suspect understood both the right being waived and the consequences of waiver. *See* *Moran v. Burbine*, 106 S. Ct. 1135, 1141 (1986). The "totality of the circumstances," including the background and experience of the suspect, must reveal an uncoerced choice and full comprehension, i.e, that the waiver was voluntarily and knowingly made, before we may conclude that a valid waiver occurred. *See* *id.* No finding of voluntariness may be made if the evidence establishes that the suspect was "threatened, *tricked*, or cajoled into a waiver." *Miranda*, 86. S. Ct. at 1629 (emphasis supplied).

104

The district court held that notwithstanding the undisputed fact that Clawson gave Soffar misleading information in response to his questions about a lawyer, Clawson did not "contradict" the *Miranda* warnings. The district court also concluded that the record of this case did not support Soffar's contention that when Soffar agreed, after asking Clawson about getting an attorney, to speak with Detective Schultz again, that he "was suddenly not aware of, or understanding of, [the] rights or consequences of waiver." We cannot agree with the district court on either of these points.

With respect to whether Clawson contradicted the *Miranda* warnings, Clawson's duty under *Miranda* was to respond honestly and completely to Soffar's questions regarding his rights, and not to undermine *Miranda* by misleading him into believing that he could not get a lawyer if he wanted one. When Soffar asked "how could [I] get a lawyer?," Clawson's response, "can you afford to buy an attorney, Max?," was a calculated move to imply that Soffar could only get a lawyer if he could afford one himself, a possibility which Clawson knew did not exist. Indeed, instead of Clawson complying with the spirit of *Miranda* by responding that he could get a court-appointed attorney if he could not afford one, it was Soffar who had to interject the idea of getting court-appointed counsel. Clawson's response to Soffar's suggestion was equally mendacious. Clawson admitted to knowing about Houston's 72-hour rule, pursuant to which a suspect had to be either charged or

105

released within 72 hours of arrest, and he admitted to knowing from his personal experience and Soffar's background that Soffar was incapable of thinking much farther into the future than the present day, but he responded to Soffar's inquiry by stating that it could take up to a month to get appointed counsel. Clawson also testified that he intentionally sped things up so that Soffar, with his limited intelligence, would not have time to clearly understand his rights or object to continued interrogation without counsel. Again, we pause to note Clawson's testimony that he was fully aware that during this encounter, Soffar would "follow my lead." Also, either Clawson's affirmative response or his implicit concurrence through silence when Soffar stated, "I guess I'm on my own," coupled with Clawson's next question, "so will you talk to the cops?," is further evidence that Clawson directly violated the tenets of *Miranda* by interfering with Soffar's ability to understand and invoke his right to counsel.

Based upon our independent review of the undisputed and uncontradicted evidence in this record, as found by the State habeas court and the federal district court, we conclude that on August 5, 1980, Detective Bruce Clawson employed deception and trickery, and he exploited his personal influence over Soffar, to convince Soffar that the right to counsel which is guaranteed all suspects undergoing custodial interrogation by *Miranda* did not apply to him and that Soffar was tricked and misled into a

106

misunderstanding of his previously waived rights.  We hold that in all essential respects, Clawson's conduct contradicted and violated the substance and spirit of *Miranda*.  Based upon the totality of the circumstances, we also hold that, contrary to the requirements set forth in *Moran*, Soffar's waiver of the right to counsel was neither knowing, by virtue of Clawson's misleading Soffar as to the nature, extent, and applicability of his *Miranda* rights, nor voluntary, by virtue of the fact that Soffar's waiver was obtained by trickery and deceit.  Accordingly, the waiver given by Soffar when he agreed to continue speaking with Detective Schultz on August 5, 1980, and every subsequent waiver of his *Miranda* rights given between August 5-7, each of which was based on his misperception that he was "on his own" and could not avail himself of the constitutional guarantees established in *Miranda*, was invalid.  Therefore, we hold that each of the written statements given by Soffar on August 5-7, were inadmissible.

### d.  *Harmless Error Analysis*

The harmless error rule applies to alleged *Miranda* violations. *See* **United States v. Paul**, 142 F.3d 836, 843 (5th Cir.) (citing **United States v. Baldwin**, 691 F.2d 718, 723 (5th Cir. 1982)), *cert. denied*, 119 S. Ct. 271 (1998).  The harmless error standard as applied in the context of habeas reviews requires that we grant relief on the basis of a constitutional error in the trial court "only if the error had a substantial and injurious effect or

107

influence in determining the jury's verdict." *Goodwin*, 132 F.3d 162 (citing *Brecht v. Abrahamson*, 113 S. Ct. 1710, 1712 (1993)) (internal quotation marks omitted).

In *O'Neal v. McAninch*, 115 S. Ct. 992 (1995), the Supreme Court rejected the notion that under *Brecht*, the habeas petitioner must bear the burden of establishing whether the error was prejudicial, and held that "[w]hen a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless. And, the petitioner must win." *Id.* at 994. In other words, as Justice Thomas observed in his dissenting opinion, "[u]nder the majority's rationale, however, the habeas petitioner need not prove causation at all; once a prisoner establishes error, the government must affirmatively persuade the court of the harmlessness of that error . . . . [T]he court thus treats the question of causation as an affirmative defense." *Id.* at 999 (Thomas, J., dissenting). Consequently, in the present case, the government must affirmatively persuade us of the harmlessness of the errors; and if we are left by the record of the trial with grave doubt about the effect of the errors, those errors are not harmless according to the rationale of *O'Neal*.

We have repeatedly acknowledged that confessions are like no other type of evidence, and they are likely "`the most probative

108

and damaging evidence that can be admitted against [a criminal defendant].'" **Goodwin**, 132 F.3d at 182 (quoting **Bruton v. United States**, 88 S. Ct. 1620, 1629 (1968) (White, J. dissenting)). And as confessions go, a full confession, unlike statements concerning only isolated aspects of a crime, "`may tempt the jury to rely upon that evidence alone in reaching its decision.'" **Id.** (quoting **Arizona v. Fulminante**, 111 S. Ct. 1246, 1257 (1991)).

In this case, our harmless error analysis is uncomplicated. Soffar was convicted almost exclusively on the basis of his written confessions and the State introduced absolutely no direct or physical evidence connecting Soffar to the bowling alley robbery-murders. No fingerprints of Soffar were found at the murder scene. No eyewitness identified Soffar as being at the murder scene. No gun was recovered from Soffar by the police and no gun was identified as the murder weapon. No items of personal property taken during the robbery were found in Soffar's possession and none were recovered by police from their search of the residence of Soffar. Notwithstanding the fact that Soffar was sentenced to death on the theory that he committed these murders with Latt Bloomfield, the State never charged Latt Bloomfield with any involvement in these murders because there likewise was insufficient corroborating evidence against him. Take away Max Soffar's illegally obtained confessions, and we have very serious doubts that the State would have prosecuted Soffar. If he were

109

prosecuted without the confessions, we have even more serious doubts the jury would have, or indeed could have, convicted him. We therefore cannot say that the admission of Soffar's illegally obtained confessions at his capital murder trial was harmless error.

## III.   CONCLUSION

Based upon all of the foregoing, we construe Soffar's motion for issuance of a certificate of probable cause to appeal as a motion for issuance of a certificate of appealability, and we GRANT him a certificate of appealability with respect to: 1) his claim that the State violated his Fifth Amendment privilege against compelled self-incrimination by interrogating him after he invoked his right to counsel; 2) his claim that the State violated his Sixth Amendment rights by interrogating him regarding an extraneous offense presented during the penalty phase of his trial after he had requested and been appointed counsel; and 3) his claim that he was denied the effective assistance of counsel based upon his trial counsel's failure to investigate, develop, and present available evidence with respect to the surviving witness's statements to police and failure to retain a ballistics expert or develop ballistics evidence.

Having also determined that Soffar's conviction and sentence for capital murder are constitutionally infirm by virtue of the State's violation of Soffar's right to counsel and his Fifth Amendment privilege against compelled self-incrimination, we REVERSE the order of the district court granting summary judgment in favor of the Director, and REMAND this case to the district court for entry of an order (i) granting Petitioner Max Alexander Soffar's petition for writ of habeas corpus; (ii) setting aside his conviction and sentence for felony capital murder; and (iii) ordering the release of Petitioner Max Alexander Soffar from custody unless the State commences a retrial of the Petitioner within 120 days.[57]  All pending motions are DENIED as MOOT.

**REVERSED** and **REMANDED.**

---

[57] We would be remiss if we concluded this opinion without recognizing the outstanding performance of Soffar's habeas counsel, James W. Schropp at Fried, Frank, Harris, Shriver and Jacobson, and David M. Miles at Sidley & Austin, and their respective associates, whose dedicated research, exhaustive investigation, and unwavering perseverance was above and beyond the call of duty for pro bono counsel.

EMILIO M. GARZA, Circuit Judge, dissenting:

A Texas jury found Max Alexander Soffar guilty of capital murder in connection with a triple homicide at a suburban Houston bowling alley. No physical evidence linked Soffar to the murder, but he confessed to the crime after being questioned by Bruce Clawson, a Galveston detective whom Soffar knew. Like the majority, I am deeply disturbed by the police's highly questionable interrogation of Soffar.[58] Nevertheless, due to our limited nature of review under 28 U.S.C. § 2254, I am not convinced that the state and federal courts erred in denying habeas relief. I must regrettably dissent.

I

The majority offers a two-tiered analysis to support its claim that the police violated Soffar's Fifth Amendment right against self-incrimination in procuring his confession. It first maintains that the police should have ceased questioning because Soffar had clearly invoked his right to an attorney. In the alternative, even if Soffar did not unambiguously request counsel, the opinion contends that Officer Clawson's misrepresentations invalidated Soffar's waiver of right to counsel.

---

[58] The gist of Soffar's argument is that his 5th Amendment rights were violated when (1) Soffar asked how he could get a lawyer, and Officer Clawson responded if he could afford to hire a lawyer; (2) Officer Clawson claimed that it could take between one day to one month to obtain a court-appointed attorney, despite his knowledge of Houston's "72-hour" rule; and (3) Officer Clawson did not respond when Max said, "so you're telling me I'm on my own."

-112-

The majority opinion's first claim that Soffar had clearly invoked his right to an attorney must meet a stringent standard. The Supreme Court has held that a "suspect must unambiguously request counsel" to trigger that constitutional right. *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed. 362 (1994) (requiring that a reasonable officer in the circumstances would deem it as a request for an attorney). While a suspect does not need to "speak with the discrimination of an Oxford don," 512 U.S., at 459, 114 S.Ct. 2350, he must request an attorney so clearly that a police officer need not "be forced to make difficult judgment calls about whether the suspect in fact wants a lawyer." *Id.* at 461, 114 S.Ct. 2350. Indeed, the Supreme Court has said that no gray area exists on this matter: "a statement either is such an assertion of the right to counsel or it is not." *Id.* at 459, 114 S.Ct. 2350 (citations omitted). A suspect must make a clear request for counsel because courts refuse "to give any 'talismanic quality' to the mere word 'attorney.'" *Griffin v. Lynaugh*, 823 F.2d 856, 863, n.3 (5th Cir. 1987).

Soffar simply failed to request counsel in an unequivocal manner. The record reflects that Soffar asked Officer Clawson whether he should get counsel, how he could get counsel and how long it would take to get appointed counsel. Courts have rejected each and every one of the above questions as too ambiguous or equivocal to constitute a "clear" invocation of right to counsel.

-113-

First, statements asking for advice on whether to obtain an attorney do not constitute a clear invocation of counsel. *See United States v. Posada-Rios*, 158 F.3d 832, 867 (5th Cir. 1998) (holding that a suspect's statement that she "might have to get a lawyer then, huh?" was not a clear request); *see also Davis*, 512 U.S. at 462, 114 S.Ct. 2350 ("Maybe I should talk to a lawyer" was not a clear request). Second, courts have ruled that a suspect's inquiry into how he can obtain an attorney is ambiguous. *See United States v. Cruz*, 22 F.3d 96, 97 (5th Cir. 1994) (holding that a suspect's statement that he was a "working man" who "couldn't afford an attorney" was not a clear request); *see also Lord v. Duckworth*, 29 F.3d 1216, 1221 (7th Cir. 1994) (ruling that when a suspect asks, "I can't afford a lawyer but is there anyway I can get one?," courts do not consider it a "clear" request for counsel). Last, courts have held that a suspect does not make a clear request for counsel when he asks a police officer how long it would take to get an attorney. *See United States v. Lux*, 905 F.2d 1379, 1382 (10th Cir. 1990).

Furthermore, as the district court noted, Officer Clawson's testimony in state court undermines the majority's claim that Soffar had made a clear request for an attorney.[59] The state habeas court, after conducting a thirteen-day evidentiary hearing, made a

---

[59] The federal district court adopted the state habeas court's findings of fact.

-114-

finding of fact in its 184-page opinion that, "Bruce Clawson did *not* consider the applicant's questions regarding an attorney an invocation of the applicant's rights" (emphasis added).[60]   The majority opinion, however, maintains that "[t]his factual finding. . .is not entitled to the heightened level of deference," and suggests that this court can adopt its own findings of fact.

I fail to see how we can ignore the presumption of correctness generally given to a state court's factual findings. *See* 28 U.S.C. § 2254(d) (1994) (a state court's findings of fact "shall be presumed to be correct"); *Demosthenes v. Baal*, 495 U.S. 731, 735, 110 S.Ct. 2223, 109 L.Ed.2d 762 (1990) ("[a] state court's determinations on the merits of a factual issue are entitled to a presumption of correctness on a federal habeas review.")

The Supreme Court has held that a "habeas court may not disregard this presumption unless it expressly finds that one of the enumerated exceptions to § 2254(d) is met and it explains the reasoning in support of that conclusion." *Burden v. Zant*, 498 U.S. 433, 436-37, 111 S.Ct. 862, 112 L.Ed.2d 962 (1991).   The majority opinion fails to cite any of the eight enumerated exceptions mentioned in § 2254(d).   Instead, it dismisses the state court's finding of fact by noting that Officer Clawson, at one point during

---

[60]    I agree with the majority that Officer Clawson's impression is not dispositive as to whether Soffar's statements actually constituted an effective invocation.  However, our legal conclusion is substantially informed by factual findings.  And here we must give deference to the state court's factual finding that Clawson himself did not consider any of Soffar's statements as a request.

the state habeas hearing, said that it was "obvious" that Soffar "wanted an attorney." Furthermore, the majority says that Officer Clawson's testimony is simply not credible because of his "admitted role as the facilitator of custodial interrogation." The majority opinion then seemingly asserts its own factual finding that Officer Clawson himself believed that Soffar had clearly invoked his right to counsel.

While Officer Clawson at one point did say that it was "obvious" that Soffar wanted an attorney, he answered differently under further questioning. He ultimately answered no to the question, "[a]t the time he made those questions or asked you those questions[,] did you consider them an invocation of rights to an attorney?" As the federal district court said in adopting the state court's findings of fact, "Clawson's state court testimony *taken as a whole* supports the finding of the state habeas court 'that Bruce Clawson did not consider the applicant's questions regarding an attorney [to be] an invocation of the applicant's rights'" (emphasis added).[61]

---

[61] During direct examination at the state habeas hearing, Officer Clawson first said that he did not construe Soffar's statements as an invocation of counsel. Then he wavered, suggesting that he thought it was "obvious" that he wanted an attorney. On cross-examination, he reversed himself again and said he did not believe that Soffar wanted an attorney. The state and federal habeas courts construed Clawson's testimony, taken as a whole, as denying that Soffar had requested an attorney. A portion of transcript from the state habeas hearing follows:
[Redirect examination of Officer Clawson]:
Q: And did you not believe that Max's comments regarding an
(continued...)

-116-

[61](...continued)
attorney were intended to get him an attorney?

A: No. Well you see here is my–I'm sorry if you'll allow me a second what you see here is my conscious [sic]. I particularly believe he needed it although I answered the question literally and honestly [at the state trial] he did not ask for one.

Q: I understand that. I'm asking what you thought was his purpose. You thought he really needed an attorney to deal with his situation. You heard him asking questions of you about at attorney. Did that not indicate to you that he was thinking of getting an attorney?

A: Okay I'll answer your question very literally, did not indicate, yes. Yes.

Q: Did it not indicate to you that at that point he wanted an attorney if one could be arranged for him?

A: I would have to speculate on the purpose of him asking the question. . .

[After several sustained objections, the redirect examination continued:]

Q: Did you draw any objection, conclusions based on everything you heard and observed from Max and everything you observed with regard to his situation which you make reference to in that affidavit. What did you conclude that Max wanted at that point?

A: What did I conclude?

Q: Yes. . .

A: Well the obvious answer is that he wanted an attorney.

[Recross-examination of Officer Clawson:]

Q: Officer Clawson at that time you had the conversation with Max Alexander Soffar did you in any way consider his questions to be an invocation to his right to an attorney?

A: No as I–

Q: And is that somewhat inconsistent with what your testimony was on redirect with Mr. Schropp?

A: Answer to Mr. Schropp's question within my answer was in the context of his question but I can see how you can take it as being inconsistent yes.

Q: And what is your testimony then, did Max Alexander Soffar invoke his right to an attorney?

A: Max Alexander Soffar never asked me for an attorney. . .

Q: At the time he made those questions or asked you those questions did you consider them an invocation to his rights to an attorney?

A: As I stated no.

Q: Had you considered them invocation to his right for an attorney would you have ceased any question?

A: Yes. And I said I wouldn't have allowed anyone else to talk

(continued...)

We cannot take out of context one statement from the habeas hearing to impugn the state court's finding of fact. Nor can we make credibility judgments about a witness. A federal habeas court must "more than simply disagree with the state court's findings before rejecting its factual determinations. Instead, it must conclude that the state court's findings lacked even 'fair[] support' in the record." *R.C. Marshall v. Lonberger*, 459 U.S. 422, 432, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983). Here, there was more than fair support in the record to sustain the state court's factual finding: Officer Clawson ultimately stated that he did not believe that Soffar had wanted an attorney.

Even if we assume that the state habeas court erred, we cannot make our own determination of the facts because we are not a fact-finding body. Rather, we must remand it to the district court for an evidentiary hearing to determine the facts. *See Farmer v. E.B. Caldwell*, 476 F.2d 22, 24 (5th Cir. 1973) ("If there is . . .merit as to the adequacy of the state habeas proceedings an evidentiary hearing was *required* of the federal habeas court") (emphasis added); *Fritz v. Spalding*, 682 F.2d 782, 785 (9th Cir. 1982) (if "the state-court was otherwise deficient," then "the petitioner is entitled to an evidentiary hearing"); *United States ex. rel. Williams v. J.E. LaVallee*, 487 F.2d 1006, 1014 (2nd Cir. 1973) (if

_____

[61](...continued)
to him.

-118-

there is "substantial doubt" as to the state court's findings, then the federal appeals court "*must*. . .remand to the district court for an evidentiary hearing on the[] unresolved issues") (emphasis added).

During the state proceedings, Officer Clawson testified that Soffar had not asked for an attorney. The majority opinion characterizes this testimony as "technically accurate," but not the "whole truth" because "he kept substantial other parts of the picture to himself, and from the jury, because he was not specifically asked." I would again stress that if the state court erred in making factual findings, we must remand it to the district court for further fact-finding.

The majority tries to compensate for the ambiguity of Soffar's statements by reading too much into the colloquy between Officer Clawson and Soffar. For instance, the majority claims that Soffar's question, "how could [I] get a lawyer?" really meant, "well, I'm innocent, so how do I get my lawyer?" because Officer Clawson had earlier told him to obtain a lawyer if he was innocent. Such a strained interpretation "ignore[s] the plain meaning of his words." *Cruz*, 22 F.3d 8, n.9 (5th Cir. 1994) (citations omitted) (holding that a court should not disregard the plain meaning of the defendant's words to find clear invocation). Officer Clawson testified in state court that he interpreted Soffar's questions))e.g., "how could [I] get a lawyer"))as a procedural

inquiry into how he could obtain an attorney, rather than as a clear request for one. At best, the meaning of Soffar's question is unclear.

The majority further maintains that Officer Clawson should have construed Soffar's statements as a request for an attorney, due to their prior relationship and Soffar's admitted inability "to think much farther into the future than the present day." I have little doubt that Soffar was weighing his options and considering requesting an attorney. But the fact remains that Soffar never unambiguously requested an attorney. Supreme Court has required this high bar of clarity, although it has recognized that this rule "might disadvantage some suspects who))because of fear, intimidation, lack of linguistic skills, or a variety of other reasons))will not clearly articulate their right to counsel although they actually want to have a lawyer present." *Davis*, 512 U.S. at 460, 114 S.Ct. 2350. The Supreme Court justified this result on the ground that a suspect has other important constitutional sources of protection. *See id.*, at 462, 114 S.Ct. at 2350 (refusing to create a "third layer of prophylaxis to prevent police questioning when the suspect might want a lawyer.")

II

I also cannot agree with the majority's alternative claim that Officer Clawson's misleading answers invalidated Soffar's waiver of the right to counsel. I believe that Officer Clawson's dubious

statements could not have nullified Soffar's waiver of his *Miranda*

rights, because Soffar had *already* waived them by the time Officer

Clawson started his fateful interrogation.[62]

In evaluating whether a suspect validly waived his *Miranda*

rights, we must see if (1) the relinquishment of the right was

voluntary in the sense that it was the product of a free and

deliberate choice; and (2) the waiver was made with a full

awareness of the right being abandoned and the consequences of

doing so. *See Moran v. Burbine*, 475 U.S. 412, 421,106 S.Ct. 1135,

89 L.Ed.2d 410 (1985).

Over the course of three hours, Soffar explicitly or

implicitly waived his right to counsel and made incriminating

comments after being read his *Miranda* rights at least *four* times.

---

[62] The majority seemingly concedes that Soffar had earlier waived his *Miranda* rights, but claims that he had invoked his right to remain silent when Detective Schultz interrogated him. The majority points out that Officer Clawson testified at the state habeas hearing that Detective Schultz told him that he had hit a "brick wall," and asked Clawson to interrogate him. Thus, according to the majority, Soffar had to re-waive his *Miranda* rights before Officer Clawson could begin questioning him. I do not believe that Soffar had invoked his right to remain silent. Officer Clawson did testify that Detective Schultz said he had hit a "brick wall," but Detective Schultz himself denied that and said that Soffar did not invoke his right to remain silent. After hearing the two dueling testimonies, the state court ultimately made the finding of fact that "the applicant's refusal to talk to certain officers or in the presence of officers was not an invocation of the applicant's right to remain silent." Moreover, the federal district court held that Soffar had failed to make a clear invocation of his right to remain silent. In short, Soffar had already waived his *Miranda* rights, and did not need to re-waive them.

First, Officer Raymond Willoughby arrested Soffar on the stolen motorcycle charge at 8:00 a.m. August 5th, he read Soffar his *Miranda* rights. On the ride back to the police station, Soffar voluntarily made incriminating statements that he was guilty of "bigger things" and said he had knowledge of the bowling alley murders in Houston. Second, at 9:45 a.m., a magistrate judge repeated to Soffar each of his *Miranda* rights. Soffar signed a form acknowledging his understanding of these rights. Third, at around 10:30 a.m., Officer Clawson read Soffar his *Miranda* rights again. Clawson testified in his state habeas hearing that he did not have to convince Soffar to talk to the police; he talked out of his own volition, waiving his *Miranda* rights. *See United States v. Andaverde*, 64 F.3d 1305, 1313 (9th Cir. 1995) (holding that a suspect can expressly or implicitly waive his rights). While the two briefly discussed the bowling alley murders, Soffar mentioned a possible accomplice, Latt Bloomfield. Officer Clawson warned Soffar the gravity of the proceedings, and told him that he might receive the death penalty if found guilty. A few minutes later, Detective Schultz joined Officer Clawson. Finally, Detective Schultz again read Soffar his *Miranda* rights, and the potential punishment if convicted. Despite this second warning about the potentially harsh consequences of a conviction, Soffar voluntarily mentioned details of the murder. Only after all these encounters and *Miranda* warnings did Officer Clawson engage in a conversation

-122-

where Soffar broached the topic of possibly obtaining an attorney.

In light of these facts, I do not see how Officer Clawson's misleading statements could have retroactively invalidated Soffar's waiver of right to counsel, given that Soffar had already waived that right. Officer Clawson did not need to read Soffar his *Miranda* rights for the fifth time before interrogating him again. There is "no requirement that an accused be continually reminded of his [*Miranda*] rights once he has intelligently waived them." *United States v. Anthony*, 474 F.2d 770, 774 (5th Cir. 1973); *see also United States v. Taylor*, 461 F.Supp. 210, 214 (S.D.N.Y. 1978) ("Once a defendant has waived his right to counsel, there is no requirement that *Miranda* warnings be repeated every time he is questioned.") Officer Clawson had no duty to re-read Soffar his rights because Soffar "must have known that his rights had not materially changed simply because he. . .faced a new interrogator." *Id. See also Evans v. McCotter*, 790 F.2d 1232, 1236 (5th Cir. 1986) (holding that because a suspect was given *Miranda* warnings twice before, he was not entitled to another one three hours later); *United States v. Weekley*, 130 F.3d 747, 751 (6th Cir. 1997) (ruling that a "re-warning is not required simply because time has elapsed.")

As the district court pointed out, there is nothing in the record to suggest that Soffar))who had been given four *Miranda*

warnings in the course of about three hours))suddenly was no longer aware of, or misunderstood his rights.  It is "self-evident that one who is told he is free to refuse to answer questions is in a curious posture to later complain that his answers were compelled." *Colorado v. Spring*, 479 U.S. 564, 576, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987).  At no point during this time did Soffar "assert a desire to be represented by counsel or to remain silent at any time."  *Weekley*, 140 F.3d at 751.  Had he done so, he would have needed to re-waive his *Miranda* rights before the police could interrogate him.  *See Edwards v. Arizona*, 451 U.S. 477, 484, 101 S.Ct.1880, 68 L.Ed.2d 378 (1981) (holding that until a suspect requests counsel, the police can interrogate him).  Soffar, however, never clearly asserted his right to counsel or invoked his right to remain silent.

The majority's reliance on *Miranda*'s admonishment that an accused should not be "threatened, tricked or cajoled into a waiver" is inapposite.  *See Miranda*, 384 U.S. 436, 476, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).  This rule does not apply here because Soffar has already waived his *Miranda* rights.  The real question here is what effect misleading answers have on the ability of a suspect))who has been read his *Miranda* rights and has waived them))to request clearly an attorney.

I believe that a recent Fourth Circuit case with virtually identical facts is instructive in regards to this question.  In

-124-

*Mueller v. Angelone*, 181 F.3d 557 (4th Cir. 1999), the suspect, who had waived his *Miranda* rights, asked at one point during the interrogation, "Do you think I need an attorney here?" A police officer shook his head, shrugged his shoulders, and told him, "You're just talking to us." The suspect argued that his initial waiver was rendered invalid because of the misleading answers.[63] The court rejected that argument and said that his "waiver remained knowing, intelligent, and voluntary even after [the officer's misleading] response." *Id.* at 575. It pointed out that the suspect had been read his rights, had signed a *Miranda* waiver form few months before during the initial investigation, and had waived his rights on three prior, non-related occasions. *Id* (*citing Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135). Similarly, Soffar had been read his *Miranda* rights four times in three hours, had signed a form in front of a magistrate judge acknowledging his understanding of his rights, had been warned twice about possibly receiving the death penalty if convicted, and had numerous prior encounters with law enforcement. Soffar's handwritten letter to his attorney belies the claim that he did not understand his *Miranda* rights: "I told them I wanted to talk to [B]ruce Clawson about the bowling alley. *I knew it would be hell on me if I said anything* but at that point I didn't care" (emphasis added).

---

[63] Citing *Davis*, the court said that the suspect failed to make a clear request for an attorney.

The majority cites a line of Fifth Circuit cases to show that Officer Clawson's misleading statements essentially invalidated Soffar's waiver of right to counsel. *See Nash v. Estelle*, 597 F.2d 513 (5th Cir. 1979); *Thompson v. Wainwright*, 601 F.2d 768 (5th Cir. 1979); *United States v. Cherry*, 733 F.2d 1124 (5th Cir. 1984). According to the majority, this line of Fifth Circuit cases had two key holdings: first, if a suspect makes an ambiguous request for an attorney, the police must ask clarifying questions to determine his true wishes; second, a police officer cannot mislead a suspect into abandoning his request for an attorney in the guise of asking clarifying questions. The majority acknowledges that the Supreme Court in *Davis* abrogated the first holding. *See Davis*, 512 U.S. at 452, 114 S.Ct. 2350 (ruling that police officers no longer have a duty to ask clarifying questions). However, the majority contends that *Davis* left Fifth Circuit's second holding unscathed. Thus, the Fifth Circuit, post-*Davis*, holds that if a police officer chooses to ask clarifying questions, he cannot use it as a guise to deceive the suspect into implicitly waiving his right to counsel. According to the majority, Officer Clawson violated Soffar's constitutional right because he chose to ask clarifying questions, and then used misleading statements to force Soffar to "essentially waive" his right to counsel.

Assuming this distinction between *Davis* and the Fifth Circuit cases is valid, it still means that the Supreme Court has not

-126-

directly addressed whether or not deceptive clarifying questions violate the Fifth Amendment.[64]  Put another way, the Fifth Circuit holdings cannot apply in this case because of *Teague*'s prohibition against "new" constitutional rules in habeas review.  *See Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).  In determining whether a rule is "new," we must "survey the legal landscape as it then existed and determine whether a state court considering the defendant's claim at the time his conviction became final would have felt *compelled* by existing precedent to conclude that the rule he seeks was required by the Constitution." *Fisher v. Texas*, F.3d 295, 305 (5th Cir. 1999) (citations omitted) (emphasis added).

The Fifth Circuit holdings cited by the majority constitute a "new" rule under *Teague* because state courts generally are not "compelled" to follow federal circuit case law.  *See, e.g., Glock v. Singletary*, 65 F.3d 878, 885 (11th Cir. 1995) (holding that federal courts of appeal "do not 'dictate' a particular rule to state courts"); *Clemmons v. Delo*, 124 F.3d 944, 955, n.11 (8th Cir. 1997) (assuming without decision that "when the Court says 'firmly

---

[64] The majority opinion says that the Supreme Court made "recognition" of the Fifth Circuit's *Thompson* holding in *Smith v. Illinois*, 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984).  I would only add that the Supreme Court recognized *Thompson* only to the extent that it noted a circuit split on the issue of ambiguous invocation of counsel.  It expressly said that it  "need not resolve this conflict in the instant case." 469 U.S. at 91, 105 S.Ct. 490.

dictated by precedent,' it means Supreme Court precedent.") *But see*, *e.g., Bell v. Hill*, 190 F.3d 1089 (9th Cir. 1999) (holding that state courts can be compelled to follow federal circuit case law if "foreordained" by Supreme Court precedent). Basic principles of federalism affirm this view. *See Lockhart v. Fretwell*, 506 U.S. 364, 376, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) (Thomas, J., concurring) ("The Supremacy Clause demands that state law yield to federal law, but neither federal supremacy nor any other principle of federal law requires that a state court's interpretation of federal law give way to a (lower) federal court's interpretation. . .An Arkansas trial court is bound by this Court's. . .interpretation of federal law, but if it follows the Eighth Circuit's interpretation of federal law, it does so only because it chooses to and not because it must.")

## III

I find the facts of this case disturbing. Officer Clawson's questioning of Soffar certainly raises many troubling questions about his interrogation technique. Nevertheless, I must emphasize that we are not in the position of a state appeals court, let alone a trial court. Under § 2254 and *Teague*, we only have a limited review of both the facts and the law. As much as I may sympathize with the result of the majority's opinion, I believe that our precedents dictate the opposite outcome. I respectfully dissent.